## **AFFIDAVIT OF DEA TASK FORCE OFFICER MARK J. CONCANNON**

I, Mark J. Concannon, a Task Force Officer with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

## **INTRODUCTION**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am a Task Force Officer ("TFO") of the Drug Enforcement Administration ("DEA") and have been so employed since October 2012. As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.

2.      In 2003, I graduated from the Massachusetts Criminal Justice Training Council basic reserve intermittent academy. In 2005, I graduated from the Massachusetts State Police Academy. I have been a police officer since 2005. As a Massachusetts State Trooper, I was initially assigned to patrol out of the Danvers and Norwell Barracks, and then to the Community Action Team in the city of Brockton working in a high-crime area focusing on gang and drug activity.  In October of 2012, I was assigned to the Division of Investigative Service and to the DEA working as a TFO in the Boston Tactical Diversion Squad. Since the spring of 2017, I have been assigned to the Boston Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force, which is a strike force incorporating various law enforcement agencies, including DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.

3.      I have a Bachelor of Science degree in Criminal Justice from the University of Massachusetts, Lowell. I have attended numerous narcotics investigation courses, including a two-

week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4.     During my time as a police officer and TFO, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. A number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.     During my time with DEA, I have participated in numerous wiretap investigations, and I have been the case agent and affiant for one such investigation. In connection with my participation in prior wiretap investigations, I have listened to intercepted communications, reviewed transcripts of those communications, and reviewed intercepted text messages and Blackberry pin to pin messages. I also have conducted physical surveillance in connection with wiretap investigations, as well as utilized global positioning system ("GPS") devices on

automobiles and GPS information for cellular telephones to surveil targets of wiretap investigations. I have worked with cooperating witnesses in conjunction with wiretap investigations and have debriefed targets of wiretaps after they have been arrested. I also have executed search warrants during the course of wiretap investigations, and participated in seizures of drugs and drug proceeds in connection with such investigations. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification and investigation.

6.      Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection and laundering of money that constitutes the proceeds of narcotics-trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.

7.      I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the common appearance, packaging, texture and smell of the narcotics listed above.

8.      I have participated in the below-described investigation since November 2019. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of the DEA, Massachusetts State Police ("MSP"), Homeland Security Investigations ("HSI"), other federal, state, and local law enforcement agencies. I make this affidavit based upon personal knowledge derived from my participation in this investigation

and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

(1)  My training and experience investigating drug-trafficking;

(2)  Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

(3)  Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

(4)  Confidential sources of information;

(5)  Public and Business records;

(6)  Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

(7)  GPS tracking device data;

(8)  Drug and money seizures;

(9)  Queries of law enforcement records and intelligence databases; and

(10)  Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

## **PURPOSE OF AFFIDAVIT**

9.   This affidavit is being submitted in support of a criminal complaint against the following individuals:

(1)  Eladio SANTOS ORTIZ;

(2)  FNU LNU, a/k/a "Chimao" ("CHIMAO");

(3)  Escarlyn BAEZ Veras ("BAEZ");

(4)  Dimerci MEJIA Heureaux, a/k/a "Katy" ("KATY");

(5)  Adelis MEJIA ("ADELIS");

(6)  Andreuris SANTOS, a/k/a "Angel" ("ANGEL");

(7)     Miseal FRIAS;

(8)     Wilson MADE, a/k/a "Nizao"

(9)     FNU LNU, a/k/a "Hamlito" ("HAMLITO");

(10)    Miosotty ORTEGA Cruz ("ORTEGA");

(11)    Louis RIVERA;

(12)    Llandry Massiel ROMERO Gonzalez ("ROMERO");

(13)    Maria LARA CANDELARIO;

(14)    Henry ESTRELLA;

(15)    FNU LNU, a/k/a "Papo" ("PAPO");

(16)    Esmerlin Herrera POLANCO; and

(17)    Stacey LAGASEE,

(collectively, the "Target Subjects") charging that beginning at least in or about March 2020 and continuing until the present, did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute controlled substances, including heroin, a Schedule I controlled substance, cocaine, a Schedule II controlled substance, and 400 grams or more of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §846 (the "Target Offense").

10.     This affidavit is also being submitted in support of applications for search warrants for the following target locations, which are described in greater detail below and in attachments to the relevant warrant applications and warrants:

1)  41 Lucerne Street, 2nd floor, Apartment 2, Dorchester, Massachusetts (hereinafter, "SANTOS ORTIZ's residence" or "Target Location #1");

2)  6 Castlegate Road, 2nd floor, Apartment 4, Dorchester, Massachusetts, (hereinafter, "CHIMAO's residence" or "Target Location #2");

3)  56 Mozart Street, Apartment 2, Jamaica Plain, Massachusetts (hereinafter, "CHIMAO's drug stash location" or "Target Location #3");

4)  17 Ellis Street, Hyde Park, Massachusetts (hereinafter, "SANTOS ORTIZ's drug stash location" or "Target Location #4");

5)  Soma Apartments, 785 Cummins Highway, Apartment 2, Mattapan, Massachusetts (hereinafter, "CHIMAO's drug stash location" or "Target Location #5");

6)  274 East Haverhill, Apartment 14, Lawrence, Massachusetts (hereinafter, "BAEZ's residence" or "Target Location #6");

7)  103 River Pointe Way, Apartment 2304, Lawrence, Massachusetts  (hereinafter, "BAEZ's drug storage location" or "Target Location #7");

8)  118 Thoreau Way, Apartment 615, Lawrence, Massachusetts (hereinafter, "BAEZ's drug storage location" or "Target Location #8");

9)  63 Vallar Road, East Boston, Massachusetts (hereinafter, "MADE's residence" or "Target Location #9");

10) 37 Cheever Street, Milton, Massachusetts (hereinafter, "HAMLITO's residence or "Target Location #10");

11) 6 Alden Court, Lawrence, Apartment 2, Massachusetts (hereinafter, "ADELIS's residence" or "Target Location #11");

12)  46 Norton Street, Apartment 2, Dorchester, Massachusetts (hereinafter, "LARA-CANDELARIO's residence" or "Target Location #12"); and

13) 267 Fuller Street, Apartment 1R, Dorchester, Massachusetts (hereinafter, "PAPO's residence" or "Target Location #13");

(collectively, the "Target Locations").

11.    This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Target Subjects identified herein have committed the above-described controlled substance offense and that evidence, fruits, and instrumentalities of that offense will be found in the Target Locations as described below.

## Summary of Evidence

### A. *Background of the Investigation*

12.     The Boston DEA Strike Force began investigating the drug trafficking activities of Eladio SANTOS ORTIZ and his associates in October 2019. This investigation began when a California-based drug cell, which is connected to a Mexico-based drug trafficking organization ("DTO"), delivered 17 kilograms of fentanyl and 23 kilograms of cocaine to Massachusetts, which were seized by investigators. Interceptions over phones used by the Target Subjects began in March 2020 and are ongoing. This investigation has used and is built upon information developed in ongoing drug trafficking and money laundering investigations being conducted by DEA groups throughout the United States, including in Massachusetts, California, New York, Florida, and Pennsylvania, information provided during interviews of confidential sources and cooperating witnesses, and extensive physical and electronic surveillance of the Target Subjects.

13.     Based on the investigation to date, investigators believe that SANTOS ORTIZ, CHIMAO, and BAEZ work with other local drug traffickers, many of whom are known to law enforcement and are targets of ongoing separate investigations, to distribute large quantities of fentanyl, heroin, and cocaine in the Boston area. SANTOS ORTIZ, CHIMAO, and BAEZ are believed to obtain illegal drugs from DTOs operating in Mexico, the Dominican Republic, Puerto Rico, New York, California, and Connecticut. The Target Subjects are also believed to contract with money launderers to launder their drug proceeds and pay drug suppliers.

14.     The evidence against the Target Subjects includes detailed and independently corroborated information from a number of confidential sources and cooperating witnesses; seizures of drugs and drug proceeds from numerous Target Subjects and their criminal associates; information from GPS tracking devices on cars used by Target Subjects; location information from

phones used by numerous Target Subjects, including SANTOS ORTIZ, CHIMAO, and BAEZ; physical and electronic surveillance of the Target Subjects; and wire and electronic communications intercepted pursuant to federal court orders.

15.     SANTOS ORTIZ, CHIMAO, and BAEZ all run independent but connected drug trafficking operations. As detailed below, investigators have intercepted SANTOS ORTIZ, CHIMAO, and BAEZ on a daily basis discussing purchasing drugs, distributing drugs to and collecting debts from their customers, and paying their own drug debts owed to their suppliers. SANTOS ORTIZ both supplies and purchases cocaine, fentanyl, and fake prescription pills from CHIMAO. SANTOS ORTIZ and CHIMAO also partner to purchase larger quantities of drugs. BAEZ supplies fentanyl to SANTOS ORTIZ.

16.     SANTOS ORTIZ, CHIMAO, ADELIS, HAMLITO, and BAEZ supply dozens of customers with various drugs, including fentanyl, fake prescription pills, and cocaine, many of whom consistently purchased drug quantities that are consistent only with redistribution (e.g., LAGASSEE, RIVERA, and ROMERO).

17.     SANTOS ORTIZ, CHIMAO, and BAEZ have employed a number of individuals who distribute drugs to and collect money from customers. ADELIS, ANGEL, and FRIAS all distributed drugs for SANTOS ORTIZ and to their own customers. SANTOS ORTIZ hired ORTEGA to transport kilograms of fentanyl from California to Massachusetts, which were seized by investigators. SANTOS ORTIZ was also intercepted negotiating with LARA-CANDELARIO to pick up a load of drugs in California and New York and receiving drugs for SANTOS ORTIZ. HAMLITO is CHIMAO's main distributor, and he also sells drugs to his own customers. KATY brokers fentanyl deals between BAEZ and SANTOS ORTIZ and collects drug debts for BAEZ. ESTRELLA and POLANCO work for BAEZ distributing drugs to his customers.

18.     In addition to conducting drug activities from their residences, SANTOS ORTIZ, CHIMAO, and BAEZ all use multiple locations to conduct their drug trafficking activities. For example, CHIMAO uses Target Location #5, the residence of his brother-in-law (hereinafter, "Cunao") and Target Location #3, the residence of his in-laws, to mix, package, and store drugs and store drug proceeds. PAPO maintains a drug stash location (Target Location #4), which is used by SANTOS ORTIZ and MADE to store, package, and prepare drugs for distribution. BAEZ is known to maintain three locations (Target Locations #6, #7, and #8), which he uses as residences and drug stash locations.

19.     As detailed below, investigators have made numerous drug and money seizures from the Target Subjects during the course of the investigation. Based on the scope and long-term and daily drug trafficking activities of the Target Subjects, there is probable cause to believe that evidence of the Target Offenses will be found in each of the Target Locations.

**B.   _Title III Electronic Surveillance_**

20.     On March 24, 2020, the Honorable Allison D. Burroughs United States District Judge, District of Massachusetts signed an Order authorizing the interception of wire and electronic communications over  (857) 269-6474 ("Target Telephone #5"), which was being used by SANTOS ORTIZ.

21.     On April 23, 2020, Judge Burroughs, authorized the interception of wire and electronic communications to and from Target Telephones #5 and (646) 251-6349 ("Target Telephone #6," used by BAEZ) and wire communications over (857) 285-8949 ("Target Telephone #7," used by CHIMAO).

22.     On May 27, 2020, Judge Burroughs authorized the interception of wire and electronic communications over Target Telephones #5, #6, and #7.

23.     On June 25, 2020, Judge Burroughs authorized the interception of wire and electronic communications over Target Telephones #5, #7, (603) 260-9033 ("Target Telephone #8," used by BAEZ), and the interception of wire communications over (351) 277-9241 ("Target Telephone #9," used by BAEZ).

24.     On July 17, 2020, Judge Burroughs authorized the interception of wire and electronic communications to and from Target Telephone #7; (857) 308-9062 ("Target Telephone #10," used by SANTOS ORTIZ); (586) 248-2651 ("Target Telephone #11," used by BAEZ); and the interception of wire communications to and from Target Telephone #9. Interceptions over Target Telephones #7, #9, #10, and #11 began on July 17 and are ongoing.

25.     Throughout the course of this investigation, your Honor has signed numerous warrants authorizing the government to obtain precise location information about the Target Telephones and other phones used by Target Subjects and to install GPS devices on vehicles used by the Target Subjects.

**<u>Probable Cause</u>**

26.     This section details the various roles of the Target Subjects in the charged conspiracy. It is divided into three parts: Part I focuses on drug and money seizures from various Target Subjects (ORTEGA, FRIAS, ANGEL, ESTRELLA, RIVERA, ROMERO, ADELIS, SANTOS ORTIZ, HAMLITO, BAEZ); Part II focuses on the scope of the Target Subjects' drug businesses and their relationships among each other and with their couriers and distributors (MADE, PAPO, ADELIS, LARA-CANDELARIO, KATY, HAMLITO, and POLANCO); and Part III focuses on the Target Locations and the links to criminal activity at those locations.

27.     The Target Subjects have been intercepted using lightly coded language to discuss the purchase and sale of cocaine, which they refer to as "palomas" (Spanish word for doves);

"arriba" (Spanish word for up or above); "perico" (Spanish word for parakeet); "crack," and

"white"; and heroin/fentanyl, which they refer to as "hard"; "manteca," "brown"; "original"; and

"abajo" (Spanish word for down); and "China." The Target Subjects also use the words "work"

and "pesos" to refer to drugs, and "tickets" or "pesos" to refer to money. They have also used the

words "car," "women," "fingers," "hands," and "pesos" to refer to quantities of drugs. I know from

my training and experience that all of these slang terms are commonly used by drug traffickers.

### Drug and Money Seizures

28.     Over the course of this investigation, investigators have seized drugs and drug

proceeds from numerous Target Subjects. These seizures, along with related intercepted

communications and surveillance observations, are described herein. Below, I also describe

numerous intercepted calls and identify the participants in those calls. Those identifications are

based on a combination of several factors, including the following: (1) intercepted statements

concerning the user's location or activity that were consistent with ongoing physical or electronic

surveillance; (2) identification, by name, of the users of the telephones during the intercepted

communications; and (3) cell phone subscriber information. I base my interpretations of these

communications upon my training and experience, the training and experience of other

investigators, and my involvement in this investigation. Quotations from telephone conversations

are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision.

All times referenced herein are approximate.

*Investigators seized drugs from FRIAS and ANGEL.*

29.     In the early morning hours on March 10, 2020, a MSP Trooper conducted a motor

vehicle stop of a Toyota Highlander, registered to ANGEL (the "Highlander") in Sturbridge,

Massachusetts. ANGEL, who was driving, produced a Dominican passport when asked for his

license and identification. The front seat passenger, FRIAS, produced a Connecticut Learner's Permit. During the stop, the trooper observed in plain view in the rear floorboard area numerous corner cut plastic bags containing white and brown powder and residue. Based on his training and experience, the trooper believed the bags contained drugs. ANGEL spoke very little English, but FRIAS communicated with the trooper in English. FRIAS told the trooper that they were driving from Boston to New York to visit ANGEL's mother. Upon further questioning, FRIAS changed his story, could not name the person they were going to visit, and ultimately said they were going to visit family, but did not know the address of the place they were going. ANGEL and FRIAS were asked to get out of the Highlander. As FRIAS got out, the trooper observed a large knotted sandwich style plastic bag containing brown residue laying under the seat near the door frame. FRIAS denied there were any drugs in the Highlander and gave the trooper consent to search it. During the search, the trooper recovered from a jacket in the backseat area a large sandwich bag containing a tan powder, which was consistent with the appearance of heroin.

30.     A canine trained in the detection of the odor of narcotics searched the vehicle. The canine alerted on the bag that was recovered from the jacket and in an area in the rear of the vehicle. Troopers searched the area, and discovered a clear plastic bag containing a white powder substance that was consistent in appearance with fentanyl. The suspected drugs were not field tested, but were sent to the laboratory for analysis, which remains pending. The bags containing the brown substance believed to be heroin weighed approximately 235 grams and the bag containing the white powder believed to be fentanyl weighed approximately 75 grams.

**SANTOS ORTIZ sold a kilogram of fentanyl to RIVERA and ROMERO, which investigators seized.**

31.     On April 16, 2020, at approximately 10:38 p.m. (call #1308), SANTOS ORTIZ used Target Telephone #5 to call (617) 309-9496 and spoke with ROMERO. During the call,

SANOTS ORTIZ told ROMERO, "Listen, I'm almost ready for you."  ROMERO replied, "I will call my mom so you can drop it off at Mami's, and I will pick it up tomorrow." SANTOS ORTIZ replied, "Alright then. I will be arriving to her like in an hour and a little more. Is that alright?" ROMERO agreed. I believe SANTOS ORTIZ told ROMERO she could pick up the drugs she ordered the following day.

32.     On April 17, 2020, around 12:00 p.m., investigators were conducting surveillance at a target location in Weymouth, Massachusetts. They observed a male, later identified as RIVERA, and a female, later identified as ROMERO, leave the location in a Honda Accord, bearing Massachusetts registration 9DL428. Investigators followed the Honda Accord to the vicinity of 83 Rosseter Street in Dorchester, Massachusetts. Investigators observed RIVERA, who had been driving the Honda Accord, enter a residence and then exit carrying a green weighted bag. RIVERA got back into the Honda Accord and departed. The car was stopped pursuant to a motor vehicle violation. RIVERA (the driver) produced an Essex County House of Corrections identification card and stated he did not have a driver's license. During the stop, investigators observed ROMERO, moving the green weighted bag from the front seat to the back seat and stuffing it under the driver's seat. A consent search of the car revealed that the bag contained what appeared to be a kilogram of drugs that was wrapped in clear plastic. The drugs field tested positive for fentanyl. RIVERA made several false and inconsistent statements, including the location where he had picked up the drugs. He later said he picked the drugs up from an unidentified male at 76 Rosseter Street. RIVERA claimed he had come from another location in Dorchester prior to picking up the drugs, but investigators had followed him directly from Weymouth. RIVERA further said that he was supposed to drive to an address in Worcester to collect $35,000 and deliver the kilogram to that address. He said "his boss" had paid him $3,000 to deliver the kilogram,

although he would not identify his boss. RIVERA also said that the person who had given him the drugs was expecting to receive three to four more kilograms of drugs that night. The suspected drugs were seized and will be sent to the DEA laboratory for testing, which remains pending. RIVERA and ROMERO were released. ROMERO provided phone number (617) 309-9496 during the stop as her contact phone number, which was the phone she used to talk to SANTOS ORTIZ on April 16, 2020.

33.     After the stop, at approximately 5:38 p.m. (call #1377), SANTOS ORTIZ received an incoming call from (646) 651-5534 and spoke with an unidentified female ("UF5534"). The call was intercepted over Target Telephone #5. During the call, SANTOS ORTIZ told UF5534 that he had "a little problem." UF5534 asked, "So what happened?" SANTOS ORTIZ said he would explain later, but he did not want to discuss it over the phone ("Yenel is going to explain you later on but don't talk about that now. Not until I tell you. Man, his cousin had a problem."). SANTOS ORTIZ explained that a female who had drugs had been stopped by police and that they had taken her car but let her go ("Yes, they supposedly stopped her on the highway and took away her car. They supposedly let her go . . . The one that was taking the stuff. The one that we talked about. Don't you remember?"). SANTOS ORTIZ told UF5534 that he was planning to go to California to pick up drugs ("I'm squaring the thing away. You know that I am leaving to . . . To California."). Based on this call and other intercepted calls, I believe SANTOS ORTIZ supplied the drugs that were seized from RIVERA and ROMERO.

### Investigators seized drugs from ORTEGA.

34.     On Saturday, April 18, 2020, investigators conducted physical surveillance at the rental car facility of Boston Logan airport after location data from Target Telephone #5 indicated it was at this location. As detailed above, calls intercepted over Target Telephone #5 indicated that

SANTOS ORTIZ planned to drive to California to pick up kilograms of drugs, presumed to be fentanyl. At approximately 1:30 p.m., investigators observed SANTOS ORTIZ and a female, later identified as ORTEGA, leaving the rental car center. Investigators spoke to the management of Hertz rental company, who confirmed that the female with SANTOS ORTIZ (Miosotty ORTEGA) had rented a vehicle (a Nissan Rogue), which was scheduled to be returned on April 23, 2020. When renting the car, ORTEGA said she was traveling to Los Angeles, California.

35.    The location data for Target Telephone #5 indicated it began traveling west bound on April 18, 2020. On April 20, 2020, the location data showed that Target Telephone #5 was in Riverside, California. Investigators observed ORTEGA and ANGEL getting into ANGEL's Highlander. The location data for Target Telephone #5 showed that it was traveling east bound on April 21, 2020.

36.    On April 20, 2020, at approximately 11:23 p.m. (call #1565), SANTOS ORTIZ used Target Telephone #5 to call ORTEGA. SANTOS ORTIZ told ORTEGA to remain where she was for 15 minutes, and ORTEGA asked, "Why?" SANTOS ORTIZ explained he needed to see her vehicle to make sure she knew which exits to take ("What do you mean for what? We have to see. Go in the front. You don't know where we are going to exit out. You have the, route but at least stay 10 or 15 minutes there just stopped."). ORTEGA argued that SANTOS ORTIZ was not taking the same route ("Do you guys know the route to follow."). SANTOS ORTIZ told ORTEGA that FRIAS would send her the route to take ("He's going to send it to you. Misa will send it to you right now."). SANTOS ORTIZ then said he would put FRIAS on the phone to explain the route to ORTEGA ("Let me put Misael on. Explain it to her."). FRIAS got on the phone and explained that ORTEGA should use the same route to Boston that they had used when they left ("Sweetie, put in the route for Boston. The same one we used to come."). ORTEGA said she had

already done so and that the GPS application on her phone said they were "41 hours away from Boston." FRIAS agreed that was the correct route. ORTEGA then warned FRIAS and SANTOS ORTIZ that a police car was behind them ("Look there's a cop right behind you guys. Be careful!"). I believe ORTEGA was traveling in the Highlander registered to ANGEL[1] with the drugs and SANTOS ORTIZ and FRIAS were traveling in the rental car. I further believe SANTOS ORTIZ wanted ORTEGA to stay close so they could conduct counter surveillance and warn each other if police cars were following them.

37.     On April 22, 2020, investigators intercepted a number of calls over Target Telephone #5 between SANTOS ORTIZ and ORTEGA, which indicated that they were traveling back to Massachusetts. SANTOS ORTIZ called ORTEGA on a near hourly basis to check her location and status. The calls further indicated that SANTOS ORTIZ and ORTEGA sent each other their respective locations so they could further conduct counter surveillance.

38.     On April 22, 2020, investigators stopped the Highlander after it entered Massachusetts. ORTEGA was alone in the vehicle. Investigators searched the Highlander and recovered approximately three kilograms of a substance that field tested positive for fentanyl secreted in a spare tire in the vehicle. Investigators intercepted calls over Target Telephone #5 after the stop during which SANTOS ORTIZ was discussing the stop of the vehicle. During one call, SANTOS ORTIZ referred to "three apparatuses" that were hidden in the vehicle. The suspected fentanyl seized from the Highlander was sent to the DEA Northeast Laboratory for analysis, which remains pending.

---

[1] This was the same Highlander that ANGEL and FRIAS were driving on March 10, 2020, when the MSP trooper seized drugs from them.

39. During the stop, ORTEGA told the trooper she was traveling from California where she had visited her father who was sick with cancer. She denied that any contraband was in the car. A canine trained in the detection of the odor of narcotics arrived at the scene. The canine showed interest in the rear of the vehicle. ORTEGA was told the vehicle was being towed for further inspection. ORTEGA declined to accompany the vehicle while it was being inspected. During the roadside stop, investigators saw the Rogue that ORTEGA had rented hit the brake lights, apparently to observe the stop of the Highlander. It then fled the scene, traveling the wrong way on a one-way ramp, and drove erratically from the scene. Investigators observed SANTOS ORTIZ in that vehicle.

**Investigators seized drugs from ESTRELLA.**

40. On April 22, 2020, Maine State Police stopped a vehicle that was being driven by ESTRELLA. BAEZ was a passenger in the vehicle at the time of the stop. A search of the vehicle was conducted, and investigators found suspected crack cocaine and fentanyl. ESTRELLA was arrested but BAEZ was not. BAEZ later posted a $10,000 bond for ESTELLA, who was released.

41. On June 11, 2020, at approximately 6:30 p.m., a New Hampshire State Trooper conducted a motor vehicle stop of a black Honda Pilot, bearing Massachusetts Registration 2GAE94, (hereinafter, the "Pilot") which was being driven by ESTRELLA. When the Trooper approached the Pilot, he saw in plain view in the center console three knotted plastic bags which appeared to contain drugs. ESTRELLA was ordered out of the vehicle. During a search of the Pilot, troopers located four knotted plastic bags containing an off-white powder that field tested positive for heroin (gross weight of approximately 156 grams) and one knotted plastic bag that contained a powder that field tested positive for cocaine (gross weight of approximately 37 grams). Troopers also discovered a hidden compartment in the rear of the Pilot, which was empty.

ESTRELLA was released after the stop. The substances seized from the Pilot were sent to the DEA Northeast Laboratory for analysis, which remains pending.

### *Investigators seized money  from BAEZ's associate.*

42.     On June 30, 2020, at approximately 3:44 p.m. (call #1095), BAEZ received an incoming call from (617) 435-2729 and spoke with Navila Pimentel Guerrero. The call was intercepted over Target Telephone #8. Pimentel greeted BAEZ, saying she was calling on behalf of the crazy men ("It's on behalf of the Locos."). BAEZ acknowledged ("Alright, yeah. Talk to me."). Pimentel asked if she should send BAEZ an address ("Yeah, should I send you the address?"). BAEZ agreed ("Yes."). Pimentel asked if BAEZ would be coming soon ("Are you coming right away, right?"). BAEZ agreed ("Yes."). After ending the call, Pimentel sent a text message to BAEZ with an address ("22 Burley st Roslindale."). BAEZ sent a text message acknowledging ("Ok."). At approximately 5:02 p.m., BAEZ sent a text to Pimentel saying that he was 12 minutes away ("12 minutes"). At 5:14 p.m., BAEZ sent a text message asking Pimentel to come out of her house ("Come out.").

43.     Investigators had gone to the area of 22 Burley Street to surveil the meeting. At approximately 5:17 p.m., investigators saw BAEZ and a female arrive at 22 Burley Street. BAEZ was the passenger in a Ford Escape, which is registered to Leomary Colon. Pimentel exited the house at 22 Burley Street and walked up to the Ford Escape (hereinafter, the "Escape"). Investigators had previously seen BAEZ in this Escape. BAEZ handed Pimentel a black trash bag through the window. Pimentel placed the trash bag into the front passenger seat of a Range Rover, which was registered to her.  Pimentel went back into the house, and about 20 minutes later, left in the Range Rover. Investigators directed a Massachusetts State Trooper to stop Pimentel's vehicle. When the trooper approached the vehicle, he saw the black bag on the passenger side

floor. Pimentel gave consent to search the vehicle. Inside the trash bag, was a shoe box containing $52,400. When asked about the money, Pimentel said that a friend in the Dominican Republic had called her through WhatsApp and asked her to pick up the money as a favor. Pimentel claimed that a man using phone number (603) 260-9033 (Target Telephone #8) then contacted her over WhatsApp and said he would deliver the money to her that same day. Pimentel said a man then arrived at 22 Burley Street and dropped off the bag, which she said contained $50,000. Pimentel claimed to not know the identity of the man who gave her the money (BAEZ). Pimentel was not arrested and was allowed to leave.  At 8:29 p.m. (call #1135), Pimentel called BAEZ and asked him to call her through WhatsApp ("Call me through WhatsApp") and BAEZ agreed. After this call, BAEZ stopped using Target Telephone #8.

### Investigators seize drugs that BAEZ sent to LAGASEE.

44.     On July 31, 2020, investigators intercepted a series of calls and text messages over Target Telephone #11 indicating that LAGASEE had ordered drugs and that BAEZ was having those drugs delivered to her. In one of the texts, LAGASEE told BAEZ she would be ready to purchase more drugs on Sunday, August 2, 2020 ("I will be ready in a couple days. Why don't we meet on Sunday and I be ready for a whole new job."). BAEZ affirmed ("So for Sunday for sure."). LAGASEE confirmed she would have payment ready for the drugs ("I'll have the paper all ready and the pay for the guys."). On August 2, 2020, at 1:49 p.m., ESTRELLA used Target Telephone #11 to call LAGASEE. During the call, ESTRELLA confirmed he would be meeting her around 5:00 p.m. and asked if he should bring her the "paperwork and stuff like that." LAGASEE confirmed she would have payment ready to pay for the drugs ("Yeah, I'll have all the paperwork for the new jobs . . . I will have payroll").

45.     At approximately 3:40 p.m., investigators established surveillance at locations in Lawrence frequented by the BAEZ, ESTRELLA, and POLANCO. At approximately 6:32 p.m. surveillance observed the Escape and a Ford Explorer (registered to ESTRELLA) arrive at 274 East Haverhill Street in Lawrence. Location data for Target Telephone #9 showed that it was in the vicinity of 274 East Haverhill Street. At approximately 6:42 p.m., location data from the GPS device attached to the Escape indicated it was in the area of 118 Thoreau Way in Lawrence (Target Location #8). A short time later, the Escape was observed arriving at 118 Thoreau Way being driven by Leomary Colon, the registered owner. At approximately 6:52, ESTRELLA's Explorer arrived at 118 Thoreau Way. Investigators saw BAEZ and Colon enter 118 Thoreau Way and then exit a short time later. At approximately 6:58 p.m., the Escape and Explorer departed the parking lot. Surveillance was maintained on the Escape. The Escape then traveled to 274 East Haverhill Street, stopped for a brief period of time, and then departed the lot and headed to Route 95. At approximately 6:59 p.m., BAEZ called LAGASEE indicating he was on his way. Investigators coordinated with the New Hampshire State Police ("NHSP") to conduct a motor vehicle stop of the Escape.

46.     At approximately 7:50 p.m. the NHSP stopped the Escape on Rt. 95 north in Greenfield, New Hampshire. The driver was identified as Colon and the male passenger was identified as POLANCO. During the stop, troopers observed a large amount of white powder in the vehicle, which based on their training and experience they believed to be fentanyl. Troopers also observed the passenger, POLANCO, to be reaching down toward the floor mixing something in a bucket of water. All of the suspected drugs were seized and Colon and POLANCO were released from the scene.

47.     At approximately 8:37 p.m., ESTRELLA used Target Telephone #11 to call LAGASEE, asking if "the guy" was there yet. LAGASEE said, "No." ESTRELLA said he would call because "they" were taking too long. After the call ended, LAGASEE sent a text message to Target Telephone #11 with her address ("8 Western Ave, Unit 7, Dover, my"). At 11:02 p.m., LAGASEE sent another text message to Target Telephone #11 asking about the drugs she ordered but were not delivered ("So what's up with the painters? . . . Is he coming?"). At 11:05 p.m., a female, believed to be Colon, used Target Telephone #11 to call LAGASEE. At the start of the call, BAEZ was heard in the background telling Colon to explain that the drugs were intercepted by investigators ("Leo, Talk to her. Explain to her. Tell her, 'Something happened to us and it was very confusing. We have your stuff, but if you can come down.'"). Colon told LAGASEE there had been an accident and asked if she could come to Massachusetts to pick up the drugs ("Hi, I just wanted to let you know that, on the way over there, a little accident happened, so we weren't able to, fully deliver it, but we have your product. We were wondering if you could come down instead."). BAEZ was heard in the background saying he would pay for an Uber ride for LAGASEE to pick up the drugs ("Have her take an Uber, and I'll pay for it."). In a follow up call, LAGASEE said she could not pick up the drugs that night but arranged to meet the following day. LAGASEE confirmed that a customer of hers named Bob had delivered $4,000 to her to pay for the drugs ("I have people waiting and Bob will be back Tuesday night and he's got 4 grand.").

48.     On August 3, 2020, at 8:38 a.m., LAGASEE sent a text message to Target Telephone #11, asking when BAEZ would be delivering the drugs ("Lmk what's up. I know is still kind of early."). At 9:27 a.m., BAEZ sent LAGASEE a text message telling her he was going to rent a hotel room to exchange the drugs and asked her to bring $8,700 to pay for the drugs ("So we are going to rent the Telly & we will let you the address . . . So you send over $8,700 please

bring the rest."). LAGASEE asked, "The Telly?" and BAEZ replied, "Hotel." In a subsequent text,

BAEZ told LAGASEE the hotel would be "on Lawrence on 114." At 10:44 a.m., Colon used

Target Telephone #11 to call LAGASEE. Colon explained the location of the hotel in Lawrence.

BAEZ was again heard in the background explaining the directions ("She gets off the highway and

hops back on."). They agreed to meet around 3:00. Based on these calls, investigators established

surveillance in the vicinity of LAGASEE's residence in New Hampshire. They saw LAGASEE

and a male and female depart her residence and followed them to the Holiday Inn on Route 114 in

Lawrence. At 2:24 p.m., LAGASEE texted BAEZ to say she was on her way. BAEZ replied with

the address and room number ("224 Winthrop Av. Lawrence ma . . . 227 room number #2nd floor.

. . The key is on at the bottom door wall hidden."). At 3:06 p.m., LAGASEE sent a text message

asking, "Is it the Holiday inn Express?" BAEZ affirmed and told LAGASEE to "leave the money

in the room." At 3:14 p.m., LAGASEE sent a text message affirming she had the drugs ("all set").

Surveillance units followed LAGASEE's car, and the NHSP conducted a motor vehicle stop on

Route16, in Portsmouth, New Hampshire. Inside the vehicle, troopers discovered a Tupperware

container, with approximately 500 grams of suspected fentanyl and 20 grams of suspected cocaine

in clear knotted plastic bag. After the stop, at 5:00 p.m., LAGASEE called Target Telephone #11

and spoke with Colon. LAGASEE told Colon about the stop and that troopers had seized the drugs

("We just got pulled over and the car's fucking seized. Nobody would let them search the vehicle

so they fucking took our information and seized the fucking vehicle . . . All the shit is in the

trunk."). BAEZ was heard in the background asking, "What happened?" The following day,

LAGASEE was intercepted over Target Telephone #11 ordering more drugs from ESTRELLA

and saying she had placed her drugs ("paint") in a storage facility. The substances seized from the

vehicle are in the custody of the DEA and will be sent to the DEA Northeast Laboratory for analysis.

### *Investigators seized fentanyl from ADELIS.*

49.     On August 3, 2020, the GPS tracking device installed on ADELIS's Jeep Cherokee indicated it was leaving from her residence (Target Location #11). After making a couple of random stops, the Cherokee began traveling northbound towards New Hampshire. Based on prior intercepted calls, investigators knew that ADELIS often delivered drugs to customers in New Hampshire. Investigators believed ADELIS was traveling to New Hampshire to deliver drugs. Investigators directed the NHSP to stop the Cherokee, which they did after observing ADELIS driving the Cherokee traveling 75/80 mph in a 55 mph zone. ADELIS consented to a search of her vehicle, and a trooper found suspected cocaine in a potato chip container inside the vehicle. After further questioning, ADELIS admitted to having additional drugs secreted in her underpants. ADELIS removed 30 fingers (approximately 300 grams) of suspected fentanyl from her underpants and gave them to the trooper. The substances seized from ADELIS are in the custody of the DEA and will be sent to the DEA Northeast Laboratory for analysis.

### *Investigators seized drugs from CHIMAO and HAMLITO's customers.*

50.     On August 5, 2020, investigators intercepted calls between CHIMAO and HAMLITO in which CHIMAO informed HAMLITO that a customer was traveling to the area to pick up drugs. At approximately 12:20 p.m., investigators saw HAMLITO in his BMW drive into the parking lot outside of Target Location #5. At approximately 12:30 p.m., a vehicle with New Hampshire license plates arrived and parked a block away from Target Location #5. HAMLITO drove his BMW and parked behind the New Hampshire vehicle. A white male got out of the New Hampshire vehicle and approached the BMW's passenger-side window. The male reached into the

BMW and then walked back to the New Hampshire vehicle clenching an object in his fist. Investigators directed MSP to stop the New Hampshire vehicle. A trooper stopped the vehicle as it traveled back towards the highway. The occupants of the vehicle included the white male who was observed meeting with HAMLITO. After questioning, a female seated in the back seat handed over one and a half fingers (approximately 15 grams) of a substance that field tested positive for fentanyl. The suspected fentanyl seized is in the custody of the DEA and will be sent to the DEA Northeast Laboratory for analysis.

**The Target Subjects Relationships and Drug Trafficking Activities**

51.     As detailed above, SANTOS ORTIZ, CHIMAO, and BAEZ have related and inter-dependent drug trafficking businesses. In this section, I describe the relationships among the Target Subjects and detail intercepted calls which explain the nature and scope of their drug trafficking businesses and roles in the conspiracy.

### 1.  *SANTOS ORTIZ – CHIMAO*

52.     Based on intercepted calls between SANTOS ORTIZ and CHIMAO, and surveillance observations, I believe SANTOS ORTIZ and CHIMAO partner to purchase large quantities of drugs and supply each other with drugs.

CHIMAO offered to help collect a drug debt for SANTOS ORTIZ.

53.     On March 29, 2020, at approximately 9:23 p.m. (call #129), SANTOS ORTIZ used Target Telephone #5 to call Target Telephone #7 and spoke with CHIMAO. SANTOS ORTIZ told CHIMAO to save the number for Target Telephone #5 ("This number is mine. Save it. The one I sent you."). SANTOS ORTIZ said that the "crazy guy" whose number CHIMAO had given SANTOS ORTIZ had called him ("What's his name? The one whose number you gave me."). CHIMAO replied, "La Ceiba?" SANTOS ORTIZ affirmed, and said that the guy called to tell him

24

that he was going to pay SANTOS ORTIZ the money the guy owed for an outstanding debt ("Yes. That he's going to give me what he owes me. That he didn't want to let me down. That he was going to pay me because he doesn't want problems with anybody."). CHIMAO explained that he had urged the guy to pay his debts ("Ah, that's exactly the way I told him. 'You think you are pretty but you owe. You have to pay.' He thinks he's pretty."). SANTOS ORTIZ said that the guy had told others "he was not going to pay anything." CHIMAO said the guy would pay ("No, it's okay. I will call those people so they can come up early."). Based on the investigation, I believe CHIMAO called a man who owed a drug debt to SANTOS ORTIZ and encouraged the man to pay his debt to avoid having problems purchasing additional drugs from others or with people using force to get him to pay ("That he was going to pay me because he doesn't want problems with anybody.").

> CHIMAO and SANTOS ORTIZ used Target Telephones #5 and #7 to discuss their drug businesses.

54.     On April 8, 2020, at approximately 4:47 p.m. (call #695), SANTOS ORTIZ called Target Telephone #7 and spoke with CHIMAO. The call was intercepted over Target Telephone #5. During the lengthy call, SANTOS ORTIZ and CHIMAO discussed collecting drug debts, their drug businesses, the rising costs of fentanyl because of the travel restrictions due to the Covid-19 pandemic, and arranged a pill transaction. CHIMAO asked if SANTOS ORTIZ had collected the drug debt that they discussed previously (see above call)("Damn, you didn't do anything? Or did the people solve that to you?"). SANTOS ORTIZ replied that he was still trying to find the person to collect the debt ("No man, there is no way to get the man because he supposedly moved from the address I had, and if we need to get him it has to be at Tipico because he goes there to drink."). CHIMAO said he would help SANTOS ORTIZ "get it one way or the other." SANTOS ORTIZ said they might have to force the guy to pay because he was delaying ("We can go take him out

his house right there. Because that guy is fresh. Did you see that he didn't even want to talk to you

or anything.").

55.     SANTOS ORTIZ suggested that they go to see the supplier the following date to

pick up drugs and money that a person owed SANTOS ORTIZ ("Let's stop by there tomorrow

then, because I want to make a visit to someone else. Because I passed one to someone, and he

owes me 21 and half and he is just giving me 1,500 pesos each 20 days."). I believe SANTOS

ORTIZ was explaining that he had sold someone a kilogram of drugs ("I passed one to someone");

that the customer owed him $21,500 ("21 and half"); and that the customer was paying him $1,500

every 20 days ("giving me 1,500 pesos each 20 days."). SANTOS ORTIZ said that his customers

were complaining about the quality of the drugs he was selling and were not paying him ("They

are saying the work came out weak, and I am told him, 'Why didn't you give it back to me? . . .

He was like, 'No, because it was already in the streets,' and I was like, 'No, my brother.' So let's

leave those two errands for tomorrow."). SANTOS ORTIZ and CHIMAO agreed to go out the

following day to "give them the first visit." CHIMAO told SANTOS ORTIZ that drugs were

offered to him earlier that day, but they were expensive ("Okay, man. Something came up today

man but . . . it is really expensive."). SANTOS ORTIZ said that a female customer who had money

to purchase a kilogram ("whole car") had called him ("The girl has the 'cachirulo' [slang for cash]

in her hands. She called me for the whole car. She has it in her hands. She has called me twice.").

CHIMAO asked if he knew how much the kilogram was selling for ("But do you know how much

it is?"). SANTOS ORTIZ said he did not, and CHIMAO told him it was selling for $35,500 a

kilogram  ("Oh well, so that you have an idea, it's 35 and half."). Based on my training and

experience, I believe they were referring to the price for a kilogram of cocaine because the quoted

price ($35,500) is within the current range of prices for kilograms of cocaine in the New England

area. SANTOS ORTIZ complained that the price was so high that he could not make a profit

selling it ("We can't even make anything out it."). CHIMAO disagreed, saying he had purchased

a kilogram for $36,000 ("Oh, but don't over think. I went to do one yesterday and I gave to the

guy at 36."). SANTOS ORTIZ and CHIMAO then complained that they could not get fentanyl

("the other thing from the other") because the pandemic had affected transportation of fentanyl

from China ("There is nothing either. You know that China closed the market.").[2] CHIMAO said

that fentanyl was now being made in Mexico ("Oh, yeah. But they are doing that right there in

Mexico, man."). SANTOS ORTIZ said that China was sending the precursor chemicals to make

fentanyl to Mexico ("Yeah, but remember that they send the food from there."). CHIMAO asked

if the Chinese were sending the precursor chemicals to Mexico so that Mexican suppliers could

make the fentanyl  ("Oh, the Chinese send the chemicals?"). SANTOS ORTIZ said that his cousin

told him that was happening ("Yeah, bottled. My cousin told me all the information."). SANTOS

ORTIZ confirmed that the Mexicans were producing fentanyl from the "food" that was sent from

"China." CHIMAO and SANTOS ORTIZ agreed that the Mexicans who "invested" in the

precursors had become "millionaires." CHIMAO and SANTOS ORTIZ agreed that no one could

get heroin ("abajo") unless they had "half of the money up front." SANTOS ORTIZ said that his

cousin told him when he started in the drug business, heroin sold for $90,000 per kilogram ("My

cousin told me that when he started it was at 90."). CHIMAO said it sold for a high of $100,000

per kilogram ("It's true. Even 100."). SANTOS ORTIZ said that the Mexicans had ruined the

market ("And they fucked the market up."). CHIMAO agreed, saying he used to buy kilograms

for $90,000 to $100,000 and could add 10 percent cut/dilutent to the drugs to increase his profit

---

[2] I know from my training and experience that the word "China" is used by traffickers to refer to fentanyl, because most of the fentanyl and precursor chemicals to produce fentanyl are produced in China.

("It's true. It was like that I remember, I got to buy at 90 man. 90 and 100 pesos . . . But it was something that you could add a whole 10 without a fear."). CHIMAO said that the suppliers then started sending diluted fentanyl ("The thing is that people started to damage it."), which changed the amount of cut a redistributor could add before reselling ("You could have added 10, fearless."). CHIMAO said that anyone who wanted to purchase large quantities had to pay money upfront to purchase the drugs ("Whoever does not have money doesn't get anything."; and "But whoever new comes asking for 20 or 30, they must have all of their money there."). SANTOS ORTIZ and CHIMAO continued conversations about their drug trafficking businesses, and then began talking about "pills." Based on the investigation to date, I believe the pills they referred to are fake prescription pills, most likely made from fentanyl.  SANTOS ORTIZ said he had made money selling pills (" That money, I saw that money through pills . . . Exchanged it for pills."). CHIMAO said he had a large quantity of pills that he could sell ("Oh man, I have a lot of pills around there. I have 500 pills, do you know who . . ."). SANTOS ORTIZ asked, "How much are you going to sell it for?" CHIMAO replied he would sell them for $5 per pill ("Five pesos."). SANTOS ORTIZ said a customer had called him the asking to purchase 700 pills ("Damn they called me the day before yesterday for 700."). CHIMAO told SANTOS ORTIZ to call the customer back ("Call people, call people back."), and SANTOS ORTIZ agreed, "Yeah, I am going to call the guy right now." CHIMAO again told SANTOS ORTIZ to call back the customer who wanted to purchase the pills ("Okay, call the guy for the pills too and let me know.").

<u>SANTOS ORTIZ and CHIMAO negotiated a 500 pill drug transaction.</u>

56.     On April 14, 2020, at approximately 2:30 p.m. (call #991), SANTOS ORTIZ called Target Telephone #7 and spoke with CHIMAO. The call was intercepted over Target Telephone #5. SANTOS ORTIZ asked to purchase pills from CHIMAO ("Do you still have the stuff for the

headache?"). CHIMAO replied, "Yes.". SANTOS ORTIZ asked if CHIMAO had at least 500 pills ("How many do you have? 500?"). CHIMAO replied, "Yes." SANTOS ORTIZ explained that his customer was going to pick up the pills from CHIMAO and that the customer would pay for the pills after he sold them ("Listen how's the deal. They are going to pick that up. It's for a small customer that I have. Because he took out almost everything I gave him. He goes and delivers them and comes back with the money."). CHIMAO told SANTOS ORTIZ to make sure the customer knew he would have to pay for the pills quickly ("But you have to tell him clearly, 'Look those people . . . that he has to call the people.'"). SANTOS ORTIZ assured CHIMAO that the customer would pay because SANTOS ORTIZ had sold 6,000 pills to the customer before ("No, no, I don't need to tell him anything . . . He has taken out from me around 6,000."). SANTOS ORTIZ made it clear that the pills were not for him but rather for a customer of his ("That is not mine."). CHIMAO explained that someone had given him the pills to satisfy a drug debt ("No, no these are for an old debt the guy had with me."). SANTOS ORTIZ said he would ask the client if he wanted to purchase more than 500 pills ("Let me ask him if he wants more."). CHIMAO explained that he had a female at his drug stash location who could give the customer the pills ("No, no, no. Call me because where I have the female customer, I have her in a place that's mine. If he wants more, he has to let me know with more time and if he wants to grab the 500 upfront and tomorrow to get the other ones."). SANTOS ORTIZ said he would call the customer, and CHIMAO replied that he had a lot of pills to sell ("Ask him if he wants more. There are a lot. The guy told me.").

57.     Later that day at 4:53 p.m. (call #1010), SANTOS ORTIZ called CHIMAO and told him that the customer wanted to purchase the pills ("the guy wants it."). CHIMAO said to send the customer to his "house" and that "his wife will give it to him." SANTOS ORTIZ said he

would send the customer so "she" could hand "that downstairs." SANTOS ORTIZ then called the customer and told him he would send the address to pick up the pills and that "a woman" was going to "hand that." SANTOS ORTIZ then sent a text message to the customer with the address, "10 Castlegate rd." As detailed herein, CHIMAO and his wife, Iskaniia Mesa Ramos ("ISKANIIA"), live at 6 Castlegate Road, which is separated from 10 Castlegate Road by an alleyway.

58.     At approximately at 6:41 p.m., SANTOS ORTIZ called CHIMAO and said that the customer was "there."  At 6:48 p.m., SANTOS ORTIZ called CHIMAO again, and CHIMAO said "My wife is heading down." At 6:51 p.m. (call #1056), SANTOS ORTIZ called Target Telephone #7 and spoke with CHIMAO. SANTOS ORTIZ told CHIMAO that the customer had arrived to pick up the pills and asked CHIMAO to send someone out to deliver the pills because there were police cars in the area ("Tell her to wait for him at the building's door because he has gone around three times with the truck, and he told me he is seeing police and the man is very difficult."). CHIAMO agreed ("Okay, tell him that is at the same driveway."). I believe SANTOS ORTIZ's customer was waiting for CHIMAO at CHIMAO's residence (Target Location #2) and for CHIMAO to send ISKANIIA down to deliver the pills to him because police were in the area. Investigators conducting surveillance observed the customer's vehicle, which was identified based on information provided in the calls, circle the block and then park. The male driver got out of the vehicle and walked toward 10 Castlegate Road. Moments later, he was seen walking back to his vehicle carrying a brown bag. A later call between SANTOS ORTIZ and CHIMAO confirmed the customer had received the pills, but did not like their quality.

<u>SANTOS ORTIZ and CHIMAO were intercepted over Target Telephones #5 and #7 discussing kidnapping ORTEGA, who they believe stole drugs.</u>

59.    On April 22, 2020, at 11:08 p.m., after investigators seized the fentanyl from ORTEGA, SANTOS ORTIZ received an incoming call over Target Telephone #5 from (571) 359-8826 and spoke with an unidentified male ("UM8826"). SANTOS ORTIZ told UM8826 that he believed ORTEGA had stolen the drugs ("I think it was the woman who played us man!"). UM8826 asked what happened, and SANTOS ORTIZ said he did not believe ORTEGA would have been released if investigators had found the drugs ("She's out and that they are going to call her to go and pick up the SUV tomorrow. Like that, listen to this story!"). UM8826 asked what SANTOS ORTIZ was going to do ("Then what?"), and SANTOS ORTIZ said he was going to have her kidnapped until she returned the drugs ("We will have to tight her up [slang for kidnap]. That's the only solution until 'that' appears.").

60.    Throughout the next two days, SANTOS ORTIZ was intercepted talking to numerous people about the seizure from ORTEGA, including ORTEGA, ANGEL, LARA-CANDELARIO, and CHIMAO. ORTEGA continued to insist that the police stopped her and took the Highlander with the drugs. In one call, SANTOS ORTIZ said that ORTEGA had seen and talked to the Mexican male who gave SANTOS ORTIZ the drugs ("Those people talked to her, and she saw who delivered 'that' and that's not mine, because if that was mine, she knows who handed it. That was the same Sombrero."). During a call with ORTEGA, SANTOS ORTIZ questioned her story and said ORTEGA knew who sold the drugs, and reminded her that the Mexican suppliers did not have "a heart or soul." ORTEGA pleaded with SANTOS ORTIZ, and asked to speak to ANGEL. ORTEGA again explained to ANGEL that she had fallen asleep while driving, which caused her to drift out of her lane. ANGEL also questioned ORTEGA's story ("You're not making sense here").

61.     On April 27, 2020, investigators told ORTEGA that they found fentanyl in the Highlander. ORTEGA was told she would be charged and would be receiving a summons to appear. ORTEGA communicated this information to SANTOS ORTIZ. SANTOS ORTIZ was later intercepted telling CHIMAO that he and ANGEL had picked up the Highlander, and that the drugs were not in the spare tire, which is where they had been hidden. SANTOS ORTIZ called CHIMAO and explained that he had lost sight of ORTEGA for about an hour during the return trip. The calls were intercepted over Target Telephones #5 and #7. SANTOS ORTIZ told CHIMAO, "I know it's her that has it. I can't waste time, you know what I mean?" CHIMAO agreed, saying "You can't." I believe CHIMAO agreed with SANTOS ORTIZ that ORTEGA had stolen the drugs, and they were plotting to get them back.

62.     At approximately 8:49 p.m. on April 27, 2020 (call #85), investigators again intercepted SANTOS ORTIZ and CHIMAO discussing kidnapping ORTEGA to make her tell them where the drugs were. CHIMAO indicated that a group would snatch ORTEGA for payment. CHIAMO said he had just "got the number for these people." CHIMAO asked if SANTOS ORTIZ had a "secure, trustworthy place" to take ORTEGA.  CHIMAO said, "And you put her away to do what you you're going to do to her. You're going to pull her ears so that she can take of what she has to take care of . . .  In other words, the plan is, for example, if she arrives here to the house, the guys are going to be hiding there, and you're going to be waiting for your usual meeting. As soon as she comes in, pow! They tie her up and they take her away. We don't have to . . . It doesn't matter if she's with somebody or if she's not with anybody. We're gonna take everybody who is with her right away.").

63.     Based on the above, investigators located ORTEGA and warned her that a confidential source had told them that her life was in danger and that SANTOS ORTIZ and

CHIMAO were trying to find her to kidnap her. ORTEGA was directed not to go home. Investigators continued to monitor calls intercepted over Target Telephones #5 and #7. Investigators also went to ORETGA's home and saw vehicles of men circling her block, confirming that SANTOS ORTIZ and CHIMAO had sent a group, likely joloperos, to kidnap ORTEGA.

64.     On April 28, 2020, investigators intercepted additional calls indicating that SANTOS ORTIZ and CHIMAO were still looking for ORTEGA. ORTEGA denied any knowledge of the fentanyl or association with SANTOS ORTIZ. ORTEGA continued to say she had driven to California to visit a sick relative.

### CHIMAO and SANTOS ORTIZ discussed kidnapping a drug customer who owed him money.

65.     On May 16, 2020, at approximately 11:49 p.m. (call #483), SANTOS ORTIZ called CHIMAO, and the call was intercepted over Target Telephones #5 and #7. SANTOS ORTIZ told CHIMAO that an unknown female customer who owed him $50,000 was hiding to avoid paying him ("That the girl who owes me the 50, she is with a cousin who does the work with her, and the woman doesn't want to pay."). SANTOS ORTIZ said that the woman's brother in the Dominican Republic had money to pay the debt and he was considering kidnapping her to get the money ("Her brother has money, because he has money in Bani. He has a villa and everything. So they are telling me just lies. And my cousin told me they should kidnap her cousin and claim his money."). CHIMAO asked if the woman owed SANTOS ORTIZ $50,000 ("50 big ones") and SANTOS ORTIZ affirmed. CHIMAO said he could explain the situation to the kidnappers ("I can explain the guys what's the situation."), and SANTOS ORTIZ cautioned not to tell them too much information ("We can't tell the guys exactly what's going on."). CHIMAO agreed and said he would not tell them how much was owed ("can't tell them how much is the amount owed.").

SANTOS ORTIZ asked if there was a place the kidnappers could take the person in the Dominican Republic ("Where can they keep him and if down there?"). CHIMAO affirmed. SANTOS ORTIZ said he wanted to do it the following day ("They want to do it tomorrow."). CHIMAO asked if SANTOS ORTIZ knew where the person to be kidnapped was staying ("Do you know the guy's location?"), and SANTOS ORTIZ affirmed, saying, "It's easy, and he was there earlier." SANTOS ORTIZ repeated that the woman was giving excuses and lying about not being able to pay ("They are just telling excuses and lies and they don't pay."). CHIMAO said he would try to get the kidnapper's phone number ("I will try to get the guy's number because I did not write it down that day."). SANTOS ORTIZ repeated he wanted "to do that tomorrow." CHIMAO said he would "call his people to see." Based on the investigation, I believe SANTOS ORTIZ asked CHIMAO to contact a group of kidnappers to kidnap a family member of the person who owed him $50,000 for a drug debt. I further believe the person he wanted kidnapped was located in the Dominican Republic. Investigators continued to monitor the calls for additional information which could reveal the identity of the person who CHIMAO and SANTOS ORTIZ intended to kidnap, but that information was never revealed.

66.    On July 12, 2020, at 5:57 p.m. (call #2474), CHIMAO called Target Telephone #10 and spoke with SANTOS ORTIZ. The call was intercepted over Target Telephone #7. CHIMAO asked if SANTOS ORTIZ had fake prescription pills to sell ("Ah, look, the buttons that you had. Do you have them there?"). SANTOS ORTIZ confirmed ("All of them are there."). CHIMAO asked how many pills he had ("How many do you have.") SANTOS ORTIZ replied, "470." CHIMAO asked how much SANTOS ORTIZ would charge per pill if he purchased all 470 of the pills ("If I buy all of them off you, how much would you give them to me for?"). SANTOS ORTIZ told CHIMAO to set the price, but suggested $3 per pill ("Hey, you set the price. Supposedly at 3

bucks."). CHIMAO said he and SANTOS ORTIZ would make "100 bucks easily." CHIMAO said

he would send HAMLITO to pick up the drugs ("So, I can tell Hamlito to pick it up right now.").

SANTOS ORTIZ asked, "How much did it come to?" CHIMAO replied, "1,410 bucks." SANTOS

ORTIZ told CHIMAO to pay him $1,300 ("That's fine. Give me 1,300.").

## 2. *SANTOS ORTIZ-KATY-BAEZ*

67.     KATY has been intercepted over phones used by SANTOS ORTIZ and BAEZ.

Based on these intercepted calls, I believe KATY brokers fentanyl deals between SANTOS

ORTIZ and BAEZ and collects drug payments on behalf of BAEZ.

<u>SANTOS ORTIZ negotiated the price for a kilogram of fentanyl with KATY and BAEZ.</u>

68.     On March 29, 2020, at approximately 3:57 p.m. (call #107), agents intercepted a

series of calls over Target Telephone #5 between SANTOS ORTIZ and KATY. During the calls,

SANTOS ORTIZ and KATY discussed the price for a kilogram of fentanyl that a supplier had

given to KATY. In the first call, KATY told SANTOS ORTIZ that her supplier originally quoted

a price of $38,000 per kilogram and then changed the price to $45,000 ("So he's telling me, 'Your

account is at 45,' and I asked him, 'What do you mean 45? If it was 38?' Then he called me and

told me, 'No, not at 38.' Because they are putting that to him at 45, that it was at 48."). SANTOS

ORTIZ argued that the supplier could not change the price he had previously quoted ("Things are

not like that because he already talked about a price. Tell him exactly that."). KATY explained

that she had already tried to negotiate the price for the fentanyl ("That's what I told him, and then

he told me, 'No, because that's not perico, that's fentanyl,' and that he can't put that so cheap.

And I told him, 'When we talked at your house, you asked me at how much they were selling it

to me, and I told you at 40, and you told me you were going to put it at 38.' And he told me, 'Well

if they are selling it to you at 40 keep grabbing it like that, because they sell that to me at 45.'"). SANTOS ORTIZ said that was "crazy" and that he would call KATY back.

69.     After this call, SANTOS ORTIZ and KATY had several conversations about the price and what could be done to get a better price for the fentanyl. SANTOS ORTIZ directed KATY to call the supplier and demand that he lower the price. KATY then called SANTOS ORTIZ back and said that the supplier would not budge on the price ("I talked to him, and he told me that he understands it was a mistake because they did give me another price, but that he cannot put it at 38 and instead of paying 45 to pay 43."). SANTOS ORTIZ told KATY to get 200 grams of fentanyl from the supplier and to call the supplier and conference in SANTOS ORTIZ so they could all talk ("Cocksucker. It's fine. Ask him if he can get you 200. Do a three way with him and me so I can talk to him.").

70.     A couple of minutes later, at approximately 3:56 p.m. (call #118), KATY called Target Telephone #5. KATY told SANTOS ORTIZ to wait while she added BAEZ to their call ("Hold on, let me add the first call. Okay, talk."). SANTOS ORTIZ told BAEZ that he had made a big mistake ("Primo that was a huge mistake . . . What happened was a huge mistake."). BAEZ said it was good that they caught the mistake before a transaction had been made ("No, I'm telling you, because if you let me know since the beginning how is everything, because we have to clarify things."). SANTOS ORTIZ told BAEZ that KATY had explained how their drug transactions would work and that SANTOS ORTIZ wanted to purchase one or two kilograms of uncut fentanyl ("So she was explaining me something. I like to grab one and two little cars in zero."). BAEZ said he understood and told SANTOS ORTIZ that his (BAEZ's) drugs were pure, that SANTOS ORTIZ could purchase drugs cheaper from someone else but those drugs were diluted ("touched"), and that BAEZ had given KATY high quality drugs in the past ("Yes, I know. She

knows how it is. Look, you know that people around give her work that's cheaper, but it's touched. She knows how it is with me, and how I am with her. You know! That's why I'm giving her the best that arrives."). SANTOS ORTIZ agreed, saying that none of his customers had ever complained about the drugs he had purchased from KATY ("And I can't tell you 'no' because nobody has said anything at this point, you know?"). BAEZ told SANTOS ORTIZ that he would never receive complaints about the quality of the drugs because he does not dilute the drugs before selling them to KATY because he only profits from brokering deals ("deal with points") and that SANTOS ORTIZ could dilute the drugs ("put your hands on it") himself to increase his profits ("No, and nobody is going to tell you anything. You can, instead of me, you put your hands on it, because that comes exactly how it is. Because I don't deal with the stuff. I deal with points."). SANTOS ORTIZ told BAEZ that his customers paid him every 15 days, and that he would pay BAEZ the same way ("So about the payments. I was telling her I have people that pay me every 15 days. You know how it is that not everybody pays weekly . . . So with that, we don't have any problem, because, for example, if you tell me, 'Pay me every 15 days.' I can give you a good amount of money. But if you want it weekly, then you know."). BAEZ said he was not "interested in weekly" payments. SANTOS ORTIZ said when he paid it would be substantial amounts ("What you want is when I'm going to give you something to be something big."). BAEZ agreed and appreciated that KATY had called him in the past to tell him when she had money to pay down her drug debt ("Yes, I know because she has called me twice without me calling her, and says, 'There's something here.' And that's good."). SANTOS ORTIZ told BAEZ he had a customer who needed "two pesos" (200 grams of drugs) and said BAEZ could pick up money that SANTOS ORTIZ owed KATY from a prior purchase if BAEZ could bring "something up" (meaning the 200 grams of drugs).  BAEZ asked, "How much?" and SANTOS ORTIZ replied,

"200 pesos. And you can grab the six pesos that are there. They are ready to be picked up." BAEZ agreed. SANTOS ORTIZ asked to meet with BAEZ so they could discuss their drug businesses in person ("Listen, and when are we going to meet up in person so we can talk at ease about our businesses?"). BAEZ said to let him know when he wanted to meet. Based on this call and the prior call between SANTOS ORTIZ and KATY, I believe SANTOS ORTIZ told BAEZ he had a customer who wanted to purchase 200 grams of drugs ("two pesos" and "200 pesos"), which I believe to be fentanyl, and that SANTOS ORTIZ told BAEZ he (BAEZ) could pick up $6,000 that SANTOS ORTIZ owed to BAEZ from a prior drug deal ("And you can grab the six pesos that are there. They are ready to be picked up.").

   SANTOS ORTIZ used Target Telephone #5 to arrange to purchase a kilogram of fentanyl from KATY and BAEZ.

71.    On April 1, 2020, at approximately 6:12 p.m. (call #317), SANTOS ORTIZ called KATY to discuss purchasing more drugs from BAEZ. This initial call was followed by a series of calls between SANTOS ORTIZ, KATY, and BAEZ, who was using Target Telephone #6. All of the calls were intercepted over Target Telephone #5. During the first call, SANTOS ORTIZ instructed KATY to tell "the guy" (BAEZ) that SANTOS ORTIZ gave "100" to a customer who "liked it." SANTOS ORTIZ asked for "200" more and said that the customer would pay the following Monday. KATY asked if SANTOS ORTIZ wanted her to conference BAEZ into the call ("a three way"). SANTOS ORTIZ declined, saying he preferred if KATY talked to him. KATY asked if SANTOS ORTIZ was planning to pay $5,000 at the time the drugs were given to him ("When he brings it to you, you are going to give him the 5,000 right away?"). SANTOS ORTIZ said he was trying to figure out if he could pay the $5,000 at the time of the sale ("That's what I'm figuring out, because I think the guy wants that here and the money is over there.").

KATY told SANTOS ORTIZ to bring the money to her ("Why don't you bring it to me, and I can tell him I have it on my hands."). SANTOS ORTIZ said he would call KATY back.

72.    In a subsequent call (call #319) at 6:16 p.m., SANTOS ORTIZ again called KATY. SANTOS ORTIZ told KATY to have BAEZ send a courier to bring him 200 grams of drugs, and he would have the $5,000 ("Tell him that when they bring it they will give him 5,000 pesos."). SANTOS ORTIZ said the customer liked the drugs ("work") he had purchased before and wanted 200 grams more ("But it has to be 200. The guy requested that because he liked the work and wants 200."). KATY said she would call BAEZ to inform him ("I'm going to call him and see.").

73.    Approximately a half hour later, SANTOS ORTIZ again called KATY(call #331). During the call, KATY told SANTOS ORTIZ that her supplier (BAEZ) had a kilogram of drugs available for sale ("a whole one"), but that SANTOS ORTIZ needed to pay down his debt from a prior purchase of a kilogram. KATY said SANTOS ORTIZ had taken too long to pay down the debt ("It has been too long already."). SANTOS ORTIZ asked how much of the debt he would have to pay in order to purchase an additional kilogram ("a whole one") ("Call him and ask him how much I have to give him so he can hand me a whole one. Ask him. Ask him how much would be the payment for him to give me a whole one."). KATY said SANTOS ORTIZ had to pay his entire debt before BAEZ would sell him another kilogram ("What you have to do is to clean the tab so he can give you another whole one again."). SANTOS ORTIZ said he could only pay down a portion of the debt because he had not yet collected payment from his customers to whom he had sold the drugs ("No, because he knows that money can't be picked up like that. Call him and ask him, 'How much has to be the payment so you can get him one.' Ask him. And I'll gather something around. And tell him, 'You know that the first one still is in the streets. So he has to do some movements and make a big payment so you can get him one.'"). KATY complained that

SANTOS ORTIZ was not making his payments timely ("Yes, but you are too fresh with that, because he's giving you work, and more work, and more work and you are not making payments. You have to charge those people."). SANTOS ORTIZ replied that he was in fact making payments and that he had only purchased the prior kilogram three weeks ago ("What do you mean? Every week we are giving money. That has just three weeks. Did you forget?"). KATY agreed to call BAEZ to ask how much SANTOS ORTIZ needed to pay before BAEZ would sell him another kilogram ("Yes, that how much has to be the payment for him to give you a whole one."). SANTOS ORTIZ asked KATY to do a "three way" call with BAEZ and SANTOS ORTIZ.

74.     Later that evening, at approximately 7:26 p.m. (call #338), KATY called Target Telephone #5 and told SANTOS ORTIZ she was going to "add the call." BAEZ was then added to the call. SANTOS ORTIZ said, "Talk to me Primo." SANTOS ORTIZ said he had talked to KATY about the fact that he had only purchased the kilogram from BAEZ three weeks ago and the debt was not old ("Look, I was talking to this woman, and I know that has been in the streets just like three weeks."). BAEZ said he understood, but that SANTOS ORTIZ had only paid $10,000 for the prior kilogram ("Yes, I know. I understand. I already have given. She asks for it, and asks, and I give it to her right? So we have some time. I already gave you one and what you have given me is 10,000 pesos; you know what I mean? . . . So you keep asking me for more and I'm not seeing money."). SANTOS ORTIZ said he needed more time to pay down his entire debt because he needed to give his customers time to sell the drugs they had purchased from him on consignment ("I can't tell you I'm going to clear our debt tomorrow, because you know that's in the street."). BAEZ said he understood, and SANTOS ORTIZ asked how much of the debt he needed to pay before BAEZ would sell him another kilogram ("So in order for you to give me one, how much is the minimum that I can give you? So I can get that for you tomorrow, because

I'm dry, you know what I mean? So I've been asked for some, and your work is good. To be honest, it's good."). SANTOS ORTIZ then mentioned the names of people from Bani, Dominican Republic, who BAEZ also knew, to convince BAEZ that he could trust SANTOS ORTIZ to pay his debt. BAEZ said he knew SANTOS ORTIZ was not a "stranger" (presumably because they both knew some of the same Dominicans) and that for "this girl" (KATY) he was willing to give SANTOS ORTIZ more drugs. I believe he was referring to KATY when he said "this girl" because as detailed above, KATY brokers the deals between SANTOS ORTIZ and BAEZ. SANTOS ORTIZ again asked how much money he needed to give BAEZ before BAEZ would provide him with another kilogram. BAEZ told SANTOS ORTIZ to "collect as much" as he could. SANTOS ORTIZ asked if BAEZ would sell him a kilogram if he gave BAEZ $15,000 towards his existing debt ("if with 15" will you give me "one."). BAEZ agreed, ("Have that on hand, and then they will plan ahead."). SANTOS ORTIZ said it was better to purchase larger quantities at a time to avoid having to meet more often, which could expose them to law enforcement detection ("It is better not to order many times, but at once to avoid problems."). SANTOS ORTIZ said he would call the following day to make arrangements to deliver the money and pick up the kilogram. Later that night at approximately 10:07 p.m. (call #353), SANTOS ORTIZ called KATY and said he was "in Boston." KATY acknowledged. I believe SANTOS ORTIZ was planning to meet with KATY to arrange the drug deal that he had negotiated with BAEZ.

          KATY told BAEZ that a shipment of drugs was coming.

          75.     On May 2, 2020, at approximately 3:27 p.m. (call #62), BAEZ called KATY. KATY told BAEZ that a drug supplier would have drugs to sell to BAEZ on Monday, May 4, 2020 ("Listen, the people of the new one will be ready on Monday, you heard? I will let you know in the afternoon."). BAEZ replied, "Alright." KATY continued to tell BAEZ that a customer

wanted to purchase drugs ("Alright. Listen, the guy I told you . . . He told me that he wanted something."). BAEZ said he would bring KATY a sample of drugs to provide to the customer ("Alright. I will bring you a sample when I come down. I'm up here."). KATY asked BAEZ to call her to tell her how much he would be bringing ("Call me to tell you how much."). BAEZ agreed.

76.     On May 10, 2020, at approximately 2:30 p.m. (call #179), KATY called BAEZ, and the call was intercepted over Target Telephone #6. During the call, KATY put SANTOS ORTIZ on the phone to explain to BAEZ that he (SANTOS ORTIZ) needed more time to pay an outstanding drug debt. SANTOS ORTIZ explained to BAEZ that the customer to whom SANTOS ORTIZ sold the drugs needed more time to pay her drug debt ("Listen, this girl over here had a small inconvenience. She wants one more week. I told her . . ."). BAEZ interrupted SANTOS ORTIZ and said he could not have more time to pay his drug debt because BAEZ had to pay his own drug debts ("No man, no. I can't because, today . . . That's why I reached out now, because I have to pay some money. I told you a week and that's a lot of time man. I can't I have commitments."). SANTOS ORTIZ said that BAEZ would have to meet with the customer to explain that she had to pay her debts ("So, you would have to come up, and we can take you there so that you explain that to her. Because I explained to her just like that, that she got a week this days and that they couldn't do it. And I told her, 'If I had of the other things, I could have done the arrangements, but you saw the deal that was dropped, and I am not doing anything right now.' So, we can go to her house and explain that to her."). BAEZ replied, "No," and said he would call SANTOS ORTIZ back.

77.     Later that same day, at approximately 7:40 p.m. (call #182), BAEZ called KATY to discuss the customer's inability to pay the drug debt. KATY told BAEZ that the customer had

a "problem with the police" and that she needed more time to pay her debt ("It seems she had a problem with the police, and she said that you could go yourself to talk because she is not telling a lie, that she can't do anything for now. She said that they will give her some money but it will arrive on Friday and that will be the only date she can schedule it for. She has 15 or 20 but she can't do anything now."). BAEZ asked if they should wait until Friday to collect the debt ("What are we going to do? Wait for Friday?"). KATY explained that SANTOS ORTIZ had brought KATY to meet with the customer to let the customer know that BAEZ wanted to be paid ("He brought me to her. I told him to bring me over, so I could speak with her, and I showed her the voice note you sent and everything."). BAEZ agreed to give the customer until the end of the week to pay the drug debt ("Okay, tell him to tell for her Friday for sure."). KATY said that she had already told the customer she needed to pay ("Yeah, I talked to her myself. I told her, and she said, 'Yes, for sure.'"). Based on the intercepted calls and investigation to date, I believe KATY sold drugs to SANTOS ORTIZ on behalf of BAEZ; that SANTOS ORTIZ sold some of those drugs to a female customer who was late to pay for the drugs because she had "a problem with the police"; and that the customer was planning to collect $15,000 or $20,000 by the end of the week ("She has 15 or 20 but she can't do anything now."), which she would then give to BAEZ.

78.     On May 12, 2020, at approximately 7:09 p.m. (call #218), KATY called BAEZ, and the call was intercepted over Target Telephone #6.  KATY told BAEZ that she was going to wait to purchase drugs from a supplier because the supplier was asking to be paid for the drugs upfront ("The guy called me just now and told me to hold off a little bit because the guy that's going to pass it is asking for money up front."). BAEZ agreed ("Yes."). KATY said she would bring the drugs to BAEZ as soon as she got them from the supplier ("I'll give it to you right away. He will let me know in a bit when the guy replies back."). BAEZ replied, "Okay."

79.     On May 15, 2020, at approximately 11:41 a.m. (call #313), KATY called Target Telephone #6 and spoke with BAEZ. KATY asked what time BAEZ would be bringing her a half kilogram of drugs ("Listen, at what time are you going to bring down what I told you, the half?") BAEZ said he would let her know ("I'll let you know."). Later that day at approximately 2:06 p.m. (call #319), BAEZ used Target Telephone #6 to call KATY. KATY said that a customer had picked up drugs to be quality checked and asked when BAEZ would be delivering the half kilogram of drugs they had discussed earlier ("He said that the guy took it to be checked, but there is no answer yet. And the other one?"). BAEZ said he would call before he brought them to KATY ("When I'm done doing something that I'm doing down here. I'm kind of far away. I'll call you.").

KATY and SANTOS ORTIZ discussed a drug debt SANTOS ORTIZ owed to BAEZ, and BAEZ used Target Telephone #9 to discuss the debt with SANTOS ORTIZ.

80.     On June 13, 2020, at approximately 3:36 p.m. (call #3336), SANTOS ORTIZ used Target Telephone #5 to call (857) 654-2631 and speak to KATY. SANTOS ORTIZ asked what BAEZ had told KATY ("What did he ask you so that I can tell you?"). KATY started to explain ("You know I had told you . . ."), and SANTOS ORTIZ cut her off, repeating what he had told KATY to tell BAEZ ("Listen carefully to what I'm going to tell you, 'Escarlyn, he said that the guy whom he gave the 150, you know that is part of the money he gave you.' I understand that one thing does not have to do with the other."). KATY interrupted ("Listen to what's happening.") and SANTOS ORTIZ said, "Listen to me." KATY replied, "No, I'm not going to listen to you." SANTOS ORTIZ told KATY to talk ("Tell me."). KATY explained that SANTOS ORTIZ had purchased the drugs and should be the person to explain to BAEZ why the drug debt had not been paid ("When you were here, I told you to call us. He called me while you were here [unintelligible], and I forgot. You are the one who needs to speak with him, because you are both men, and you were the one who handed it in, and he was who gave you that. You are the one who

should speak with him. Take me out of it."). SANTOS ORTIZ asked why BAEZ had called

KATY ("So why did he call you then? Don't you think he should have called me?"). KATY

explained that BAEZ did not have SANTOS ORTIZ's number ("Because he doesn't have your

number saved."). SANTOS ORTIZ began to tell KATY that she should tell BAEZ that SANTOS

ORTIZ would pay on Monday ("If he calls you, tell him that on Monday, I gave something to the

guy."). KATY again told SANTOS ORTIZ to call BAEZ directly ("But you can tell him yourself.

You have his number."). SANTOS ORTIZ said he would talk to BAEZ, but wanted to explain

what KATY should say if she spoke to him before ("So fuck! He can call me, damn. I'm

explaining to you damn it. Listen to me. If he calls you, tell him that and that's it. Because he has

my number. He had asked you for it."). KATY and SANTOS ORTIZ continued to argue until the

call ended.

81.     After ending the call, at approximately 3:42 p.m. (call #3337), SANTOS ORTIZ

used Target Telephone #5 to call Target Telephone #9 and spoke with BAEZ. The call was

intercepted over Target Telephone #5. SANTOS ORTIZ said he had told KATY that he had sold

drugs that he had purchased on consignment from BAEZ to another customer and he was waiting

for the customer to pay him before he could pay BAEZ ("I was explaining her, right? The guy

whom I gave the thing, right? . . . I had told you that he had given me some up front, for me to

care for him . . . So since I was not able to take care of him, he told me about the money he had

given me, he was going to take what I gave him. I told him, 'Okay, a test.' So I got him something

through somewhere else, because you had not given that to me . . . So he's going to make me a

payment on Monday, whatever is my profit from that, I'll pass it along to you. You get me?").

BAEZ agreed ("Yes.). SANTOS ORTIZ confirmed that he would pay BAEZ what he got from

his customer ("So I'll pay you the 150. I'll be giving you whatever he gives me. But give me at

least until Monday."). BAEZ agreed ("Okay."). SANTOS ORTIZ said he hoped he would be able to start repaying BAEZ for another drug debt soon ("Hopefully starting the following week, not this weekend, I'll start taking care of you about the other thing."). BAEZ agreed ("Alright then."). SANTOS ORTIZ complained about how KATY handled the issue with BAEZ ("This woman does not know how to explain. I explained her just like this. I told her, 'Explain to him this and that.' But she does not understand."). BAEZ understood ("Alright, no problem.").

82.     After ending the call with BAEZ, at approximately 4:08 p.m. (call #3340), SANTOS ORTIZ used Target Telephone #5 to call KATY. SANTOS ORTIZ told KATY he had explained the payment issue with BAEZ ("I explained him, and he said there was no problem. You couldn't do that?"). KATY replied that SANTOS ORTIZ had told her something different, which is why she wanted him to talk to BAEZ directly ("It's not that. Listen what happens. The other day you told me, 'Tell him that I am going to give him something Saturday from something that is not from his but from another thing, because what he gave, I gave it to someone I owe money to.' I told him that. I told him that when he called me. I told you that, but you should be fine speaking to him because he is not going to bite me, and he is not going to do that to you either because you are the one who is receiving his things. So get me out of it and you speak to him."). SANTOS ORTIZ agreed ("Okay, we will talk about it later.").

83.     On July 20, 2020, at 9:52 p.m. (call #301), KATY called Target Telephone #9 and spoke with BAEZ. BAEZ told KATY to find out when drugs were coming in because he had customers waiting ("Find out. I have a couple of deals in the streets."). KATY said the supplier told her the drugs would be arriving later that week ("I was telling him, you know that I [unintelligible]. I asked him, and he told me like it was arriving this week."). BAEZ said he could pick up the drugs on Saturday or Sunday and needed to collect drug proceeds to pay his suppliers

("Alright. So, then you tell him for Saturday or Sunday. Saturday or Sunday. I have to collect for these people for Monday."). KATY said she would call ("Alright. I'm going to call him now.").

### 3. CHIMAO-HAMLITO

84.     As detailed herein, HAMLITO is CHIMAO's main drug courier. HAMLITO has been intercepted on a near daily basis getting instructions from CHIMAO about to whom and where to deliver drugs and/or collecting drug debts. Intercepted calls also indicate that HAMLITO distributes drugs to his own customers. As detailed above, on August 5, 2020, investigators seized approximately 15 grams of suspected fentanyl from customers of CHIMAO after HAMLITO delivered the drugs to those customers.

<u>CHIMAO and HAMLITO discussed purchasing drugs.</u>

85.     On May 5, 2020, at approximately 8:38 p.m. (call #231), CHIMAO received an incoming call over Target Telephone #7 from HAMLITO. During the call, CHIMAO told HAMLITO he was planning to get drugs the following day and needed HAMLITO to bring him money, which he referred to as "tickets" ("Be on the lookout for the thing tomorrow. So you can get me the tickets tomorrow."). HAMLITO agreed and CHIMAO said he needed to check the quality of the drugs so his customers did not complain ("So I can get on it and check it. If they don't complain to me."). HAMLITO warned CHIMAO to only purchase the drugs if they were good quality ("Chimao, only if it's good.") and said he had bought drugs from the same supplier ("Because I took 10 of that, and it's like the one you like. Like the one that you add the cut and it gets lumpy."). CHIMAO asked if the drugs needed to be repackaged ("Do you have it or do you have it prepared?"). HAMLITO said the supplier only had 50 grams of drugs to sell ("There's only 50."), and CHIMAO complained that he needed more ("I can't do anything with 50. Talk to me of 100."). HAMLITO said another person named "Michael" possibly had 100 grams of drugs

to sell, but he too might only have 50 grams ("Yes, we can talk of 100 because Michael . . . He came with a story . . . But that's a lie. It's probably that he passed along 50 to someone else."). CHIMAO said he would get the drugs the following day ("Oh, so I'll go get it tomorrow.") but HAMLITO said he would pick them up ("No, that's fine. I'll go get it.).

86.     On May 11, 2020, at approximately 12:04 p.m. (call #366), CHIMAO called HAMLITO, and the call was intercepted over Target Telephone #7. HAMLITO asked how much drugs CHIMAO's customer had requested ("Okay, he wants six?"). CHIMAO replied, "12 . . . He wants . . . he is going to pay me . . . he is going to pay . . . let me see . . . 11 and a half." CHIMAO said another customer named "Oreja" also wanted to purchase drugs ("Oreja is calling me to have 50 more ready, you hear?"), and HAMLITO agreed ("Okay."). HAMLITO asked if a person named "Yol" had reported on the quality of some drugs ("What about Yol? Did he tell you how that was? It is good?"). CHIMAO said he thought the drugs were good ("It seems it's good, because Derek told me that he wants the same."). CHIMAO said the drugs had to be good because Derek would have otherwise returned them ("So, it has to be the same, if not they'll return it.").

87.     On May 13, 2020, at approximately 5:09 p.m. (call #403), HAMLITO called CHIMAO. HAMLITO asked if CHIMAO wanted some drugs, possibly pills ("Do you want 100 of those things? I already asked for 50."). CHIMAO agreed ("Alright, that's fine. Bring it over.").

88.     On May 15, 2020, at approximately 3:37 p.m. (call #435) HAMLITO called CHIMAO to discuss purchasing substances used to dilute or "cut" drugs, which they refer to using the Spanish slang word "cortina" or "corte," which translates in English to "cut."  HAMLITO told CHIMAO he had $100 to purchase cut ("I have 100 pesos that just came in for the cut.") CHIMAO asked why HAMLITO did not just buy bottles of cut ("Why don't you buy bottles with those 100."). HAMLITO said he liked the cut he was buying better ("I'm going over to him to get some

cortina . . . because it's better."). CHIMAO said that was HAMLITO's decision to make ("That's your problem.").

89.     On May 16, 2020, at approximately 3:49 p.m. (call #469), CHIMAO called HAMLITO. CHIMAO asked where HAMLITO was because he needed HAMLITO to prepare a two gram sample of drugs for a new customer to test ("For you to prepare me two numbers, two grams . . . get it at Cunao's. To sell it to . . . We're going to start selling to a guy, an old customer. He buys two grams for 110 bucks."). HAMLITO agreed. CHIMAO said he was also waiting to hear from another customer about how much drugs the customer planned to order on a weekly basis ("And I'm waiting for another one to plan ahead, to see how much he does per week. I'm going to send something to him."). HAMLITO asked, "Did Cunao organize that?" CHIMAO said he was going to call to ask Cunao to break a finger of heroin/fentanyl to prepare the sample ("No, I'm going to call him now so he can take out the grams, to break one of those fingers. And he's calling me to organize it. He's going to send me two or three so I can see it. But you know, he buys the grams at 50."). HAMLITO agreed and said he would go to retrieve the drug sample ("I'll swing by Cunao's right now.").

90.     On May 20, 2020, at approximately 2:19 p.m. (call #563), CHIMAO used Target Telephone #7 to call HAMLITO. CHIMAO asked HAMLITO to send him the address of a drug customer who wanted to purchase drugs ("Send me an address . . . The guy wants one."). HAMLITO replied that he had two units of drugs in his possession ("I have two on me."). CHIMAO asked if he should send the customer to HAMLITO ("Should I send the guy around there?"), and HAMLITO replied, "Yes."

HAMLITO and CHIMAO discussed purchasing cocaine.

91.     On June 19, 2020, at 3:34 p.m. (call #1357), HAMLITO called CHIMAO, and the call was intercepted over Target Telephone #7. HAMLITO told CHIMAO a supplier had a half kilogram of cocaine for sale for $22,000 ("A friend has half of the arriba for 22."). CHIMAO asked the price for the whole kilogram ("How much for one?"), and HAMLITO responded it was $44,000 ("44."). CHIMAO asked if the quality was good ("That is good?"). HAMLITO replied they would have to inspect it but the supplier was nearby ("We have to go see it . . . it's close by."). CHIMAO said if the quality was good, they could make a profit reselling it ("If it is like that, we can make some money."). HAMLITO asked CHIMAO to pick him up because he knew where to go to inspect the cocaine ("Come get me. I know where"). CHIMAO said he was waiting to collect money from someone ("I am waiting on someone who is going to get some money I have there.") but told HAMLITO to ask the supplier to hold on to the cocaine until he could inspect it ("Save it there.").

92.     Later that evening at 6:27 p.m. (call #1372), HAMLITO called CHIMAO, and the call was intercepted over Target Telephone #7. HAMLITO reported that the cocaine he inspected was acceptable ("The thing is good."). CHIMAO instructed him to purchase it ("Go for it.") and to bring it to "the house." Based on the intercepted calls, I believe HAMLITO tested the cocaine, reported the quality was good, and CHIMAO directed him to purchase it. However, after this call, HAMLITO called CHIMAO and told him the supplier wanted to remove an ounce of cocaine from the half kilogram but still charge him $22,000 ("She says it's at 22, but she wants us now to take out an ounce for her."). CHIMAO objected, saying it would no longer be a half kilogram ("It won't be half then."). HAMLITO said he believed they could still resell the cocaine and make a profit ("We can sell whatever is there."). CHIMAO replied, "It's 470." HAMLITO said the quality

was good, and someone tested it on his tongue and almost threw up ("[U/I] is there almost throwing up trying it on his tongue."). CHIMAO told HAMLITO to ask for a better price ("give a better price"), but HAMLITO said the supplier would not reduce the price because the supplier had another customer who would pay $23,000 for the cocaine ("She won't give it for less than that . . . will send someone to see it right there and sell it to them at 23."). In subsequent calls, CHIMAO told HAMLITO not to purchase the drugs because of a dispute over the price.

CHIMAO asked HAMLITO to deliver drugs to a customer.

93.    On July 1, 2020, at 1:54 p.m. (call #2123), CHIMAO called HAMLITO. CHIMAO asked if HAMLITO could send 20 grams of drugs to a customer ("Do you think we can send 20 to Pata Mocha [translated from Spanish as the "limping guy"]?"). CHIMAO explained that the customer was planning to purchase less often and that CHIMAO needed to know how much drugs were on hand ("Yes . . . He is going to be coming less during the week, and he is going to take more time to come. But, I told him I was going to call him back while I was going to calculate how much there are left."). HAMLITO asked when the customer wanted to purchase the drugs ("Yeah. When does he wants to come?"), and CHIMAO replied, "Today." HAMLITO said he could deliver the drugs to the customer in the parking lot and would make sure no police were around ("We can bring him in the parking lot, and if we find a vehicle behind him we will check it out."). CHIMAO told HAMLITO that ADELIS thought ANGEL and FRIAS had reported SANTOS ORTIZ to the police because they thought SANTOS ORTIZ had stolen drugs from them ("She is saying that has to be related to the problems with the guys and what happened . . . Because they are saying Carreton has to be involved with that . . . The problem in Lawrence and the guys that got stuff stolen this and that . . . You know they have a problem with the guys that La Grandota used to work for . . . They have a problem . . . They got stolen and they are saying it

was Carreton, this and that. And then they are saying it was her. They have their problem there. But you know what we have already talked about, you have been there . . . She is saying that they were the ones who snitched on him."). CHIMAO complained that ADELIS needed to be careful because she was making too many trips delivering drugs and was concerned they were going to get caught ("I am going to tell her, 'Listen what's going on. We are dancing around too much, you are doing too many trips, and we are not doing anything.'"). HAMLITO told CHIMAO he should not work with ADELIS anymore ("Let that woman loose because you don't know her."), and CHIMAO agreed ("I am going to let her loose.").

### 4. SANTOS ORTIZ-ADELIS

94.     ADELIS originally worked for SANTOS ORTIZ primarily as a courier. She was intercepted over Target Telephone #5 discussing a drug shipment with SANTOS ORTIZ, which ADELIS traveled to New York city to collect. As detailed below, ADELIS's relationship with SANTOS ORTIZ evolved as she began to build her own customer base, which is primarily in New Hampshire. ADELIS continued to purchase drugs from SANTOS ORTIZ for her business, but appeared to have other suppliers as well. ADELIS also appeared to be trying to gain the trust of SANTOS ORTIZ and to have more responsibility within his organization.

<u>ADELIS and SANTOS ORTIZ discussed drug their drug trafficking businesses.</u>

95.     On May 10, 2020, at approximately 8:30 p.m. (call #715), SANTOS ORTIZ called ADELIS. ADELIS said she had drug proceeds to give to SANTOS ORTIZ ("I am calling you because I have something for you . . . of Pano's."). SANTOS ORTIZ asked how much ("You are so good. How much is it?"), and ADELIS said she had $2,300 ("I have 2,300 for you here."). SANTOS ORTIZ told ADELIS to bring the money to him and that she could take more drugs to sell ("Alright, so if you want come up so you can take some . . . I have something here. If you

want to take 200 pesos or one and a half. Whatever you want."). ADELIS asked about other drugs that SANTOS ORTIZ had said he would give her ("And how much did you say you were going to give me of the thing?"), and SANTOS ORTIZ said he would give her those drugs as well ("Oh, from that I will give you . . . No, I will add it there as well . . . They can be at least 15 or 20 numbers."). ADELIS told SANTOS ORTIZ to give her a sample of drugs so she could test their quality ("So what you are going to do is you are going to take out what you are going to give me, and I will test it and I will tell you just then."). SANTOS ORTIZ said he did not have much left ("Alright, that's at the end."), and ADELIS complained that he had not given the drugs to her earlier so that she could sell them to her own customers ("Man, that's what you always say and I ended up losing. I am going to keep track. I am working for you."). Later in the call, SANTOS ORTIZ asked how much drugs ADELIS had that were not already sold ("So how much is it left from mine?"). ADELIS replied that she still had 200 grams ("200 pesos") and that she owed SANTOS ORTIZ $2,500 for the drugs that she had purchased on consignment ("I owe you 2,500."). SANTOS ORTIZ told ADELIS to call him when she planned to pick up the drugs and that he could send the drugs to her if she was busy ("Okay, yes, yes. Alright so call me and if not I can send it to you. You call me."). ADELIS agreed ("Alright then.").

96.     On May 11, 2020, at approximately 11:52 a.m. (call #724), SANTOS ORTIZ used Target Telephone #5 to call ADELIS. During the call, SANTOS ORTIZ asked ADELIS if she could help him rent a car. SANTOS ORTIZ asked ADELIS to call rental places to see if she could rent a car for him under her name and that he would "give her a nice gift" if she rented one. ADELIS agreed, but told SANTOS ORTIZ not to tell anyone that the car was in her name ("control your tongue and don't tell people that car is under my name."). SANTOS ORTIZ agreed that he "talk(s) too much." ADELIS told him not to trust anyone and that she never tells people

where she is going ("Don't trust anybody. I always keep secret about all of my movements."). ADELIS referred to the seizure of fentanyl from ORTEGA, saying it happened because SANTOS ORTIZ did not use her (ADELIS) to transport the fentanyl from California ("What happened with that crazy woman was because you made a bad decision. You have to use me."). SANTOS ORTIZ agreed ("We will work differently now."). ADELIS said she believed that investigators had placed a GPS device on the SUV that ORTEGA was driving, which belongs to ANGEL ("I think that SUV has a GPS and has to be monitored."). ADELIS said SANTOS ORTIZ made a mistake in using ANGEL's Highlander instead of renting a car for the trip ("Your mistake was not to rent a vehicle to do that."). SANTOS ORTIZ told ADELIS to call him after she learned if she could rent a car for him.

97.     Shortly after this call ended, ADELIS called SANTOS ORTIZ back at approximately 12:03 p.m. (call #727), to tell him that she could rent a car for approximately $40 or $45 a day. SANTOS ORTIZ told ADELIS to rent the car and then he would go with her to deliver drugs ("Look what are you going to do it's simple. Take care of it. Bring the car and will take the thing down. And I'll take you. I'll take you there."). ADELIS said she would call FRIAS ("Misa") to take care of the car rental and that she could make drug deliveries for FRIAS ("If he (FRIAS) needs me to run an errand."). SANTOS ORTIZ told ADELIS not to tell FRIAS anything ("Don't say anything."). ADELIS said she had been making drug deliveries using her car and that FRIAS and ANGEL should rent a car for her ("I'm pressuring them to rent a car because I have been going up there with my same vehicle for more than a month."). ADELIS complained that she was only "an employee" and was not making as much money distributing drugs as FRIAS and ANGEL were making ("I'm making a little bit of profit of what they are making.") SANTOS ORTIZ agreed that FRIAS and ANGEL were making a lot of money ("They are making a lot of

money."). SANTOS ORTIZ said that FRIAS had collected $20,000 for him from customers. ADELIS assured SANTOS ORTIZ that she knew what she was doing and could get more customers ("I know how to speak English and I have skills. I'm getting more customers . . . I was able to sell the last stuff immediately."). SANTOS ORTIZ said the drugs he had now were very good and that ADELIS should not add too much cut to the drugs if she wanted to sell to more customers ("The thing I have now is very good . . .If you want to sell the work faster, make it low."). ADELIS complained that the drugs SANTOS ORTIZ gave her to sell were weak ("The thing you were giving it to me was at four, and I didn't make too much profit. I can't work like that because my total profit wasn't even 2,000 bucks."). SANTOS ORTIZ agreed to give ADELIS stronger drugs so she could make more money selling it to her customers ("Okay. I'm going to get for you one and a half, for business, and I'll get the other stuff for you . . . at least 40 or 35 . . . of the other stuff to help you out."). ADELIS asked how much drugs SANTOS ORTIZ would give her ("How much are you going to give me of business?"), and SANTOS ORTIZ replied they had agreed on an amount because she was helping him sell other drugs ("I will get you of the thing we agreed on, and at least 20 more because you are helping me with the other stuff."). SANTOS ORTIZ asked if ADELIS wanted 150 grams or 200 grams ("But I will get you one and a half of business. Or do you want 200?"). ADELIS asked what SANTOS ORTIZ was charging her for the drugs ("No man! Hold on! At how much are you going to give me that? . . . the last stuff . . . you gave it to me at 55, at 45."). SANTOS ORTIZ said he would sell the drugs at $45 per gram and that the drugs were high quality ("I will give it to you at the same. At 45, and (the stuff) is very good."). ADELIS said she wanted to test the drugs first, and if they were strong, she would buy 150 grams ("I prefer to test it first and if it's good I will take the one and a half. If not, I will return it."). SANTOS ORTIZ agreed.

### 5. *SANTOS ORTIZ- CHIMAO- LARA- CANDELARIO*

98.     LARA-CANDELARIO distributes drugs, which she purchases from SANTOS ORTIZ, and also facilitates SANTOS ORTIZ's and CHIMAO's drug trafficking businesses in various ways, including picking up loads of drugs, allowing them to use her vehicle to distribute drugs, and allowing them to use her home to send drug packages. SANTOS ORTIZ and CHIMAO also congregated at LARA-CANDELARIO's residence (Target Location #12) on April 27, 2020, to formulate their plan to kidnap ORETGA after the drug seizure. SANTOS ORTIZ also sent LARA-CANDELARIO to pick up ANGEL's Highlander after investigators released the vehicle post seizure from ORTEGA. The calls detailed below are representative of her role in the conspiracy.

LARA-CANDELARIO counted drug proceeds for SANTOS ORTIZ.

99.     On April 25, 2020, at 4:48 p.m., SANTOS ORTIZ called LARA-CANDELARIO. SANTOS ORTIZ asked LARA-CANDELARIO about cash that she had counted and stored for SANTOS ORTIZ ("Listen, there's 10 there, because I see one more pack here. What's with these ones?"). LARA-CANDELARIO confirmed that each package of cash contained $100 ("Each of those packs are of 100."). SANTOS ORTIZ asked if she had counted accurately ("Did you count it well? There's 10 right? Because I have to give it."). LARA-CANDELARIO affirmed ("Of course, love. There is no extra money there."). Based on the investigation, I believe LARA-CANDELARIO counted and packaged money, which were drug proceeds, that SANTOS ORTIZ needed to give to satisfy a drug debt.

LARA-CANDELARIO assisted SANTOS ORTIZ in attempting to kidnap ORTEGA.

100.     On April 27, 2020, LARA-CANDELARIO, FRIAS, and ANGEL went to pick up the Highlander that investigators had seized from ORTEGA. SANTOS ORTIZ was intercepted

calling FRIAS and telling him to check to see if the drugs were still inside the tire ("stop and see if the tire still has air in it."). As detailed above, investigators intercepted numerous calls between CHIMAO and SANTOS ORTIZ in which they discussed hiring people to kidnap and torture ORTEGA. Later that evening, at approximately 8:20 p.m., investigators saw the Highlander parked near LARA-CANDELARIO's residence (Target Location #12), along with a vehicle known to be used by FRIAS. In addition, LARA-CANDELARIO's vehicle (a white "RAV-4") was running and had people inside of it. The RAV-4 and FRIAS's car left together and headed in the direction of ORTEGA's residence. The RAV-4 was followed to the area of ORTEGA's residence and was seen passing by ORTEGA's residence. The location data for SANTOS ORTIZ's phone indicated it was in the area of ORTEGA's residence at the same time the RAV-4 was in that location. Marked police cruisers were sent to the area, and the RAV-4 and FRIAS's car left the area. At 9:20 that same night, investigators saw SANTOS ORTIZ standing outside of the RAV-4, which was parked near 6 Castelgate Road, which is CHIMAO's residence (Target Location #2). At the same time, investigators intercepted calls between CHIMAO and SANTOS ORTIZ in which they continued to discuss kidnapping ORTEGA.

<u>SANTOS ORTIZ asked LARA-CANDELARIO to broker a fentanyl deal.</u>

101.    On June 4, 2020, at 12:43 p.m., SANTOS ORTIZ called LARA-CANDELARIO and asked if she knew a drug dealer named "Gordo" ("The guy you know is Gordo?"). LARA-CANDELARIO said her supplier was another person ("The guy I'm with is another guy."). SANTOS ORTIZ asked if her supplier had drugs, which he referred to as "food" ("Do you know if he has food?"). LARA-CANDELARIO said her supplier's name was "Aramis" and asked if she should inquire on behalf of SANTOS ORTIZ ("I don't know. Should I ask him?"). SANTOS ORTIZ told her to ask if he had fentanyl, which he referred to as "f" ("Call him and let me know

right away. But ask him about the regular one. You tell him the 'F' and he will know."). LARA-CANDELARIO repeated, "the F" and agreed.

> CHIMAO and SANTOS ORTIZ partnered to purchase kilograms of heroin/fentanyl, which LARA-CANDELARIO was being paid to transport.

102.    On June 9, 2020, at approximately 2:15 p.m. (call #976), SANTOS ORTIZ called CHIMAO. The call was intercepted over Target Telephones #5 and #7. SANTOS ORTIZ told CHIMAO he wanted to meet in person to talk about a drug shipment ("We have to meet in person to talk about a deal."). CHIMAO asked what kind of drugs ("of what"), and SANTOS ORTIZ replied it was heroin ("below one."). SANTOS ORTIZ said he had found the heroin for a low price, but they would have to travel to pick it up ("I found a good price but we have to go down there to the place."). CHIMAO asked who would be traveling to pick up the shipment ("Who is going to go there?"), and SANTOS ORTIZ replied that he had already found someone (he was "already set."). SANTOS ORTIZ and CHIMAO agreed to talk further.

103.    On June 9, 2020, at approximately 1:44 p.m. (call #2879), SANTOS ORTIZ used Target Telephone #5 to call LARA-CANDELARIO. SANTOS ORTIZ asked if LARA-CANDELARIO remembered him talking to her about a trip ("Do you remember what we talked about down there?") and she agreed. SANTOS ORTIZ told  LARA-CANDELARIO to talk to another female and said they would all meet together later that evening ("Talk to the girl and we can meet up tonight . . . to talk."). LARA-CANDELARIO agreed. SANTOS ORTIZ cautioned LARA-CANDELARIO not to talk to anyone else about the trip ("don't tell anything to anybody"), and LARA-CANDELARIO said the same was true for SANTOS ORTIZ ("That's what I'm telling to you."). LARA-CANDELARIO confirmed the female was "trustworthy." SANTOS ORTIZ said he was going to try again to transport drugs from California to Massachusetts ("I'm going to gamble it again."). SANTOS ORTIZ told LARA-CANDELARIO

to tell the other female who would be going on the trip to meet later that night to discuss the details ("I'm going there tonight, and tell her to go.").

104.     Later that day, at approximately 1:59 p.m. (call #2891), SANTOS ORTIZ called ANGEL. The call was intercepted over Target Telephone #5. SANTOS ORTIZ told ANGEL that he was going to send LARA-CANDELARIO to pick up drugs ("Listen, you know the young girl of the white SUV? The, our female friend in the white guagua . . . Ah, to give her the mission. What do you think?"). ANGEL told SANTOS ORTIZ they could discuss the trip in person ("Wait until we go down."). SANTOS ORTIZ agreed, but said the drug transaction was being arranged soon ("Alright. It's that they were arranging for quick. I will wait until later on."). I know that LARA-CANDELARIO owns a white RAV-4, which SANTOS ORTIZ has been seen driving. Accordingly, I believe SANTOS ORTIZ called ANGEL to ask his opinion about whether LARA-CANDELARIO could be trusted to transport the drug shipment he was negotiating.

105.     On June 10, 2020, at approximately 1:26 p.m. (call #3011), SANTOS ORTIZ used Target Telephone #5 to call LARA-CANDELARIO. LARA-CANDELARIO told SANTOS ORTIZ she had talked to her friend about making the trip to transport the drugs but her friend had not committed to the trip ("I talked to her and she told me she is going to call me later because she is working, I already told her."). SANTOS ORTIZ suggested that if the female was not willing, he and LARA-CANDELARIO could make the trip themselves ("If not, let her go, and let's go you and I. Let her go."). LARA-CANDELARIO  said the female had committed, but wanted more details ("No, no. Listen to that. She called me earlier, and she said yes, that it was okay, and she will call me later to talk better about it. She take cares of elderly, you know she is a nurse. But she said yes. And when is it?"). SANTOS ORTIZ said the details were being negotiated, but the transaction would occur soon ("Oh, everything is getting done for tomorrow

or the day after tomorrow."). SANTOS ORTIZ said they needed to finalize the details ("We have to square that up good."), and LARA-CANDELARIO suggested they talk later that night. SANTOS ORTIZ asked if LARA-CANDELARIO still intended to fly out to California and drive back with the drugs ("Do you think is good that way you told me? First up (by air) and come back below (by driving)?"). LARA-CANDELARIO agreed, and said her friend had a plan ("Of course. She has a plan. Let's . . . I am going to call her and tell her to come tonight.").

106.    Later at approximately 9:26 p.m. (call #3074), LARA-CANDELARIO called Target Telephone #5 and spoke with SANTOS ORTIZ. LARA-CANDELARIO told SANTOS ORTIZ that her friend wanted to meet with SANTOS ORTIZ the following day at 6:30 ("The girl came but she had to leave because she had an emergency. She said to go to her house tomorrow at 6:30."), and SANTOS ORTIZ agreed. LARA-CANDELARIO said her friend wanted to know how much SANTOS ORTIZ would pay her to make the trip and transport the drugs ("She wants to know how much and all."). SANTOS ORTIZ agreed to meet with the female the following day ("Okay, we'll do it like that then.").

107.    On June 13, 2020, at approximately 2:23 p.m. (call #3325), SANTOS ORTIZ called CHIMAO and asked him to meet him at a Dunkin Donuts ("D&D"). The call was intercepted over Target Telephones #5 and #7. After ending the call, SANTOS ORTIZ called LARA-CANDELARIO, and said he needed to meet with her to discuss "something urgent." He gave her the address of a Dunkin Donuts restaurant, located at 641 Washington Street, Jamaica Plain, Massachusetts.

108.    On June 14, 2020, at approximately 1:20 p.m. (call #3390), SANTOS ORTIZ called CHIMAO. The call was intercepted over Target Telephones #5 and #7. SANTOS ORTIZ told CHIMAO he finalized the negotiations for the drug purchase with someone in the Dominican

Republic and had put up his mother's house as collateral for payment on the deal ("Listen, where can we meet? I am ready for the other one. I already made the deal over there, but I did it with my mother's."). CHIMAO replied that he had $10,000 to contribute ("Damn, man I have 10 there man! I have it there at my father-in-law's, man.").[3] SANTOS ORTIZ said he needed the money and did not know who to get it from ("Damn, man. I don't know who else I can ask for more money. I did not want to put it, but I had to."). CHIMAO asked when SANTOS ORTIZ planned to make the trip ("When are you thinking to go up?"), and SANTOS ORTIZ said "tomorrow." CHIMAO complained, saying he needed drugs immediately to sell to a customer ("Damn, I need that, guy. That guy is going to bring me that money."). SANTOS ORTIZ asked which customer, and CHIMAO replied, "The 200. 100. 100 and something. We can talk to the guy and tell him what he have." SANTOS ORTIZ said the deal was already finalized and that expenses would be paid by a customer who was purchasing a portion of the drugs ("That was an agreement already made, you follow? So he already squared things up that way for the price situation you follow? And he explained to me, he even told me, 'Listen the expenses.' Someone is going to give me some of his money like 4,000 pesos and he told me, 'Use that, it will be 2,500 for the trip expenses' . . . To take from his own. So let's meet up to figure things out and we see what's up. I am going to take a shower and where do I go?"). CHIMAO told SANTOS ORTIZ to meet him at his house.

> SANTOS ORTIZ told LARA-CANDELARIO that they would drive to New York to pick up drugs.

109.   On June 17, 2020, at approximately 6:36 p.m. (call #3683), SANTOS ORTIZ called LARA-CANDELARIO. LARA-CANDELARIO asked about the status of the trip ("What happened?"), and SANTOS ORTIZ explained that the drugs would be picked up in New York

---

[3] This is believed to be Target Location #3, which is the residence of CHIMAO's father-in-law.

rather than California ("Things have changed . . . But whatever it is, you and I will go do it in New York."). LARA-CANDELARIO asked if she would now be going to New York ("To New York?"), and SANTOS ORTIZ confirmed that he would go with her ("Yes, but you and I can do that."). LARA-CANDELARIO asked how many kilograms she would be picking up ("How much?") and SANTOS ORTIZ said five kilograms ("five"). LARA-CANDELARIO asked how much money SANTOS ORTIZ was planning to pay her to pick up the drugs ("How much are you going to give me?"), and SANTOS ORTIZ replied $5,000 ("Five"). LARA-CANDELARIO complained about the payment ("Damn for five? 1,000 for each."). SANTOS ORTIZ explained that he would accompany her ("But you're going with me."), LARA-CANDEALRIO continued to complain about the payment ("That doesn't matter . . . Damn, you are a thief."). SANTOS ORTIZ asked to borrow LARA-CANDELARIO's car the following day, and said he would give her drugs that she requested ("Tomorrow, so I can also give you what you asked me. I have that on me.").

SANTOS ORTIZ sent drugs to LARA-CANDELARIO's residence (Target Location #12).

110.   On July 21, 2020, investigators intercepted calls over Target Telephone #10, indicating that SANTOS ORTIZ had purchased six kilograms of drugs, which he had delivered to LARA-CANDELARIO's residence. At 11:47 a.m., SANTOS ORTIZ called LARA-CANDELARIO.  SANTOS ORTIZ asked what time LARA-CANDELARIO would be home ("At what time are you going to be home?"). LARA-CANDELARIO replied and asked why ("Around 5:00 what happened?"). SANTOS ORTIZ told her to call him to pick up a package of drugs ("Call me to take the thing."). SANTOS ORTIZ asked if LARA-CANDELARIO had spoken to another female about receiving drug packages ("And can you talk to the woman about the thing I told you?"), and LARA-CANDELARIO agreed ("I will tell her and see what she has to tell me. If she

says that's fine I will let you know."). SANTOS ORTIZ explained the drug package would not be addressed to the woman, but only her address ("Yes; because you know that won't arrive under her name."). UF agreed to ask ("I will let you know. I will tell her."). SANTOS ORTIZ asked UF to call him so he could pick up the drug package and pay LARA-CANDELARIO for allowing him to use her address to send the drugs ("Call me shortly, to go and bring you your thing because I like to take care of things right away . . . You earned that! That's yours. I can't play dumb. God will punish me."). LARA-CANDELARIO told SANTOS ORTIZ he had to inform her ahead of sending packages because her landlord had seen the package, which had an unknown name on it ("Dude! You are so fresh man! You have to let me know . . .Do you want to know who gave me that? The landlord, and I told him, 'I don't know who's that.'"). SANTOS ORTIZ if the package had been left ("They left it there?"), and LARA-CANDELARIO said it was left at her door ("They dropped it at the door. But he was outside and you know when a package arrives and he's outside, he take it inside at the stairs, and he asks, 'Who's this belongs to?'"). SANTOS ORTIZ was grateful the landlord had not opened the package ("Lucky us that he did not open it."). LARA-CANDELARIO told SANTOS ORTIZ to not send packages without first notifying her ("No, he doesn't open anything . . . But you have to tell me man, 'Not like this!'"). SANTOS ORTIZ said he would compensate LARA-CANDELARIO for receiving the package ("We will square things up now.").

111.    Later that day at 1:51 p.m., SANTOS ORTIZ called LARA-CANDELARIO again and asked if someone was at her home because SANTOS ORTIZ needed to send someone to pick up the drugs that were delivered to her house ("My cousin needs to go pick it up."). LARA-CANDELARIO told him to leave drugs for her inside a drawer ("Leave the 'thing' over there, in the drawer."). SANTOS ORTIZ said he would give the drugs directly to her because he did not

want to be carrying it with him ("No, I'll give 'it' to you . . . I went to put it away because I can't

have it on me. I called you earlier to tell you I wanted to bring it to you."). LARA-CANDELARIO

agreed. Based on the prior call, I believe SANTOS ORTIZ gave LARA-CANDELARIO drugs to

compensate her for receiving the larger package of drugs.

112.     On July 31, 2020, at 12:16 p.m., SANTOS ORTIZ called LARA-CANDELARIO.

During the call, LARA-CANDELARIO was overheard talking on another phone with an

unidentified male ("UM"). SANTOS ORTIZ told LARA-CANDELARIO to ask the UM if the

UM could check the quality of a sample of drugs ("Ask him if I can bring him something to check

it out or does he want something. Tell him I'm Carlos's friend.").  LARA-CANDELARIO is

heard telling the UM, "He says he is Carlos's friend. The one from Lawrence . . . He says if you

need something so he can bring you something or what?". UM said for SANTOS ORTIZ to call

him. UM asked if it was a sample of drugs ("He says he got a sample or something like that?").

SANTOS ORTIZ affirmed, and LARA-CANDELARIO repeated, "Yeah, he has a sample." UM

said for SANTOS ORTIZ to call when he arrived and UM gave LARA-CANDELARIO the

address where SANTOS ORTIZ was to drop off the drug sample.

### 6.  *SANTOS ORTIZ-MADE-PAPO*

113.     MADE has been intercepted over Target Telephones #5 and #10 discussing the

collection of drug proceeds and the acquisition of drugs with SANTOS ORTIZ. PAPO has also

been intercepted over Target Telephones #5 and #10 discussing mixing drugs for SANTOS

ORTIZ. As detailed below, based on intercepted calls and surveillance, I believe PAPO maintains

a drug stash location at 17 Ellis Street (Target Location #4) and that SANTOS ORTIZ uses this

residence to store drugs. MADE has also been seen at this location. Accordingly,  I believe MADE

and SANTOS ORTIZ both employ PAPO, and his cousin Omega ("Mega") to mix and package drugs.

114.    MADE has been intercepted over Target Telephones #5 and #10 discussing the collection of drug debts and the acquisition of drugs with SANTOS ORTIZ. MADE has been intercepted using at least four different phone numbers to talk to SANTOS ORTIZ: (978) 242-6886; (617) 735-5262; (617) 505-0194; and (978) 242- 5723. MADE was first intercepted over Target Telephone #5 using telephone number (978) 242-6886 to discuss drug business and drug debts with SANTOS ORTIZ. For example, on May 21, 2020, MADE called SANTOS ORTIZ to discuss a drug debt that SANTOS ORTIZ owed. During that call, MADE asked when SANTOS ORTIZ was going to pay the debt ("How are we going to solve that?"). SANTOS ORTIZ replied that he would have to pay ("Call me in a bit so I can give it to you. We have to pay it.").

115.    On May 26, 2020, New York DEA agents informed me that a money pickup was being arranged between New York-based and Massachusetts-based money launderers. On May 28, 2020, based on information provided by the NY DEA, investigators set up surveillance in the area of 8 Allstate Road, Dorchester, Massachusetts. That is the address of the South Bay shopping plaza.

116.    On the morning of May 28, investigators went to the area of 685 Hyde Park Avenue in Boston, which was a location given for one of the money pickups. Investigators observed a black Mitsubishi SUV, bearing New Jersey registration M70LAC (the "Mitsubishi"), arrive at the location. Two Asian males were inside the car. After approximately 10 minutes, the Mitsubishi departed the area, followed by surveillance. The Mitsubishi made a second stop at a location in Lowell, Massachusetts, which was being surveilled by investigators conducting a separate money

laundering and drug trafficking investigation. At that location, investigators saw a Hispanic male deliver a white trash bag to the two Asian males inside the Mitsubishi.

117.    Investigators followed the Mitsubishi to 9 Allstate Road in Dorchester (the address previously provided for the money drop). At approximately 11:27 a.m., investigators observed a Toyota Camry, registered to MADE (the "Camry") arrive and park in the vicinity of the Mitsubishi. MADE got out of the Camry and retrieved a purple bag from inside the rear passenger's seat. MADE was scanning the parking lot appearing to be trying to locate someone. At approximately 11:29 a.m., investigators saw MADE approach the Mitsubishi from the rear, walk around the front of the vehicle, and enter the rear passenger's seat with the purple bag. Approximately two minutes later, MADE got out of the Mitsubishi and returned to the Camry without the purple bag. As he walked toward his car, he continued to look around the parking lot, apparently conducting counter surveillance. MADE left the area in the Camry. At approximately 12:37 p.m., investigators saw the Camry parked in front of SANTOS ORTIZ's residence (41 Lucerne Street).

118.    Investigators followed the Mitsubishi as it departed the meeting with MADE. The two Asian males stopped at a Chase Bank, located at 345 Harrison Avenue in Boston. The two males entered the bank carrying the purple bag and the white trash bag, which investigators had seen them pick up from another individual in Lowell before the meeting with MADE. After approximately two hours, the two Asian males exited the bank and got back into the Mitsubishi. Chase bank confirmed that the two Asian males had deposited $230,000 into an account while they were inside the bank. Chase bank further confirmed that $1 million in cash had been deposited into that same account in the 10 days prior to the May 28 deposit. Investigators stopped the Mitsubishi as it travelled west on I-90. There was no money found in the car. The two males

reported that they had been in Boston visiting colleges. Based on my training and experience and the investigation to date, I believe MADE works with SANTOS ORTIZ to distribute drugs, collect drug proceeds, and launder money. I further believe that on May 28, 2020, the purple bag that MADE delivered to the two Asian males contained drug proceeds, which were then laundered through the Chase bank account.

<u>MADE met SANTOS ORTIZ at PAPO's drug stash location (Target Location #4).</u>

119.    On July 22, 2020, at 5:04 p.m. (call #819), SANTOS ORTIZ used Target Telephone #10 to call Target Telephone 9128 and speak to PAPO. SANTOS ORTIZ asked if PAPO was at his "house," and PAPO confirmed he was. SANTOS ORTIZ told PAPO to open the door to the rear of his house ("Open up from the back."). PAPO said he was on "the patio" and told SANTOS ORTIZ to "come over there." SANTOS ORTIZ agreed. Investigators went to the area of 17 Ellis Street (Target Location #4) to conduct surveillance. At approximately 6:15 p.m., investigators saw MADE's Camry and a rental vehicle that SANTOS ORTIZ had been observed using for weeks parked outside of 17 Ellis Street. At 6:19 p.m. (call #824), SANTOS ORTIZ received an incoming call over Target Telephone #10 from (857) 246-0222 and spoke with an unidentified male ("UM0222"). SANTOS ORTIZ told UM0222 that he was mixing some drugs ("I'm fixing something here, but I'm in the area, are you going out?"). UM0222 replied, "No." SANTOS ORTIZ again said he was pressing some drugs ("I'm pressing something around here."), which I believe he was later going to sell to customers. At approximately 6:51 p.m., MADE walked down the driveway from 17 Ellis Street to the Camry and left the area. At approximately 7:16 p.m., SANTOS ORITZ walked down the driveway from 17 Ellis Street carrying what appeared to be a soft-sided lunch box. He placed the lunch box in the trunk of the rental car and departed the area.

Based on the investigation to date, I believe both MADE and SANTOS ORTIZ went to PAPO's house to press and pick up drugs for sale.

120.    Again on July 24, 2020, investigators saw MADE's Camry outside of 17 Ellis Street. At 3:24 p.m., SANTOS ORTIZ received a call from (857) 261-3906 and spoke with JUAN, a drug customer who also mixes drugs for SANTOS ORTIZ. JUAN told SANTOS ORTIZ, "Come tonight to get what I made." SANTOS ORTIZ told JUAN he had "sold the other stuff." JUAN said that the customers had complained about the quality of the heroin, which he referred to as "manteca," which I know is a common street slang for heroin ("that mateca doesn't work"). JUAN said he "took out what he could" and had "five left" but it was not the quality of the "first one" that SANTOS ORTIZ had given him. JUAN said his customers "got upset" and had asked for their money back. SANTOS ORTIZ said he would "press that stuff more" and asked what JUAN wanted. JUAN asked if SANTOS ORTIZ had made "the hard stuff" and SANTOS ORTIZ affirmed. JUAN asked for a drug sample ("10 and the hard stuff").  At 4:30 p.m. that same day, investigators saw MADE's Camry parked in the vicinity of 17 Ellis Street. I believe SANTOS ORTIZ was pressing drugs for a customer (possibly at 17 Ellis Street) and that MADE went to 17 Ellis Street, possibly to pick up drugs for his own distribution.

    MADE ordered drugs from SANTOS ORTIZ.

121.    Later that same day on July 24, at approximately 9:07 p.m., MADE called Target Telephone #10 and spoke to SANTOS ORTIZ. MADE asked if SANTOS ORTIZ had drugs ("Do you have that?"). SANTOS ORTIZ affirmed ("yes"), and MADE said he had a customer who wanted to purchase the drugs ("There is a guy that wants that."). SANTOS ORTIZ asked if the customer snorted cocaine ("He sniffs?"), and MADE asked if SANTOS ORTIZ had "small balls," which I believe was a reference to eight balls of cocaine (1/3 ounce of cocaine). SANTOS ORTIZ

said he had ounces of cocaine as well ("I have ounces too."). SANTOS ORTIZ quoted a price of $1,900 per ounce ("Tell him I have it at 1,009.") and that it was pure ("Original"). MADE said he would tell his customer ("Okay. Let me tell him.").

122.    Between June 1, 2020 and July 19, 2020, the GPS device on MADE's Camry indicated that it went to SANTOS ORTIZ's residence (Target Location #1) approximately 50 times; to PAPO's residence (Target Location #4) approximately 80 times; and to BAEZ's drug stash location/residence (Target Location #7) approximately three times. I believe all of these trips were drug related.

        SANTOS ORTIZ discussed paying PAPO and Mega to mix fentanyl.

123.    On July 17, 2020, at 5:16 p.m. (call #271), SANTOS ORTIZ called (857) 230-8687 and spoke with an unidentified male ("UM8687") and another unidentified male ("UM1"). The call was intercepted over Target Telephone #10. After greetings, UM8687 said that people hate the "joloperos" and people who "work with police." UM8687 and UM1 told SANTOS ORTIZ he had to be "cautious especially with the situation being so bad, where people have no money, no work, and the pandemic." UM8687 said it was hard to obtain drugs and drug payments during the pandemic ("It's hard to get products. It's difficult to get money."). SANTOS ORTIZ asked if UM8687's suppliers had sent him drugs ("So they haven't sent anything?"). UM8687 said he was expecting the drugs soon, but that the suppliers had been saying that for months ("They have started to send, but not yet . . . It's been three months, saying tomorrow, then they say another day."). SANTOS ORTIZ said he heard the drugs had arrived in New York ("Because I heard they were in the towers place."). UM8687 said he was first told the drug shipment had arrived in Connecticut and then in New York ("No man. They first said Connecticut, then in the towers place. Then they keep changing the days."). UM8687 said he did not think the shipment had

arrived and did not know when they would because of travel restrictions from the pandemic ("There's nothing yet. A guy who is over there told me there is no date. He told me, 'Don't listen to anybody, there is no date' . . . It's the transport that is fucked up."). SANTOS ORTIZ said he had gotten some drugs (which I believe are fentanyl) that were in powder form and had a blueish tent ("I got something yesterday, but it came powdery . . . Have you seen something they send that is blueish?"). UM8687 said that he had ("Some blue product, right? . . . Yes, I've seen that work."). SANTOS ORTIZ said that customers had returned it because of the color ("That is the problem. It got returned to me because of that."). UM8687 said people were afraid to use the fentanyl ("People get afraid. I had a little bit of that kind."). UM1 said his customers liked the fentanyl ("People like that one.") and that when you mixed it, it turned the color of oregano ("When you mix it, it looks like oregano."). UM8687 said he had 200 grams of that fentanyl and had to sell it cheap ("I had 200 of that and I had to give it away at 10 pesos."). SANTOS ORTIZ said his customers did not like it because it clogged the syringes when they tried to inject it ("Yes people don't like it. That it clogs the thing. Some crazy stuff."). SANTOS ORTIZ said they needed to be "careful." UM8687 agreed and said they needed to switch cars often ("Be careful and know how to move. One can't be long with a vehicle . . . So no one knows."). UM1 agreed ("It's better if they see you in different cars. It's better to rent weekly."). SANTOS ORTIZ said he was planning to return his rental vehicle soon ("I'm going to return this one soon because I crashed it . . . Yes, not to be long with cars."). UM1 asked where SANTOS ORTIZ was, and SANTOS ORTIZ replied he was near PAPO's house ("I'm by Hyde Park, close to where PAPO lives."). SANTOS ORTIZ said someone from the Dominican Republic had given PAPO and Mega two kilograms of drugs the day before ("An uncle of mine, he's a friend of mine from Mata Gorda. He gave them two, I think the day before yesterday.") and that PAPO received drugs often ("Yes

because he gets a lot of them. He gave it to them original."). UM1 asked, "To PAPO? . . . Or Omega?"). SANTOS ORTIZ confirmed the drugs were given to PAPO ("No, to PAPO."). SANTOS ORTIZ said Mega (Omega) could be reckless with mixing drugs ("Yes because you know the reckless one is Mega . . . The one that got returned to me, I gave it to him."). UM1 asked, "Which one?" SANTOS ORTIZ said drugs Mega had mixed were returned by a customer ("The one someone returned to me yesterday . . . No to Mega. In order to finish it up."). UM1 asked if SANTOS ORTIZ's supplier charged him a lot for the fentanyl ("Does the one who sells you, sell it expensive?"). SANTOS ORTIZ said he purchased a kilogram for $47,000, but was able to add 500 grams of cut to it ("47. But it held 500."). SANTOS ORTIZ said he had made a profit selling it ("Yes, the numbers are good."), but the issue was with the color ("Right the color is the issue."). UM1 asked if SANTOS ORTIZ was going to PAPO's ("Damn familia. So you are heading to Papo's now?"). SANTOS ORTIZ said he was going soon to see if PAPO could remix the fentanyl to correct the color ("In a bit. So I grabbed one and I haven't been able to fix it."). SANTOS ORTIZ said he did not want to mix the fentanyl himself because when he opened the fentanyl packaging, the fumes made him sick ("Hey, I'm not going to kill myself. My chest is swollen . . . When they opened it."). UM8687 said that indicated the fentanyl was potent ("So it's good if it's like that."). UM1 told SANTOS ORTIZ to use a mask when mixing the fentanyl ("Use a mask."). UM8687 asked how much SANTOS ORTIZ paid Mega to mix the fentanyl for him ("How much do you give Mega to do that job?"). SANTOS ORTIZ replied that he gave Mega 30 grams of the uncut fentanyl to mix the fentanyl for him ("You know that to Mega I have to give him at least 30 original."). UM8687 said Mega did not charge him more because he liked SANTOS ORTIZ and that UM8687 had previously had to give Mega half of the drugs to mix them for him ("It's because he gets along with you, but in the beginning when I was with the man

of L, it was half and half."). SANTOS ORTIZ asked, "Just to fix it?" UM8687 affirmed and said that Mega and PAPO supplied everything to mix the drugs ("Yes, half and half. He used to supply everything."). SANTOS ORTIZ said that PAPO and Mega supplied all of the equipment and cutting agents to mix his drugs for him ("Damn, but regardless. They supply everything. I give 30 to them and they put everything."). SANTOS ORTIZ said that Mega did a good job cutting and mixing the drugs ("And Mega does good work. He puts them as if they come from over there . . . That man has talent to fix that."). SANTOS ORTIZ told UM8687 to call him when he heard when the shipment of drugs would be arriving ("So let me know if anything.").

<u>SANTOS ORTIZ called PAPO and asked him to mix drugs for him.</u>

124.    On July 18, 2020, at 5:20 p.m. (call #244), PAPO used (857) 346-9128 to call SANTOS ORTIZ. The call was intercepted over Target Telephone #10. SANTOS ORTIZ said he was waiting for a supplier to sell him 500 grams of drugs ("I'm still waiting for the guy . . .get like 500 to add something."). PAPO told SANTOS ORTIZ to let him know when he was ready to mix or press the drugs ("Let me know when you are ready."). SANTOS ORTIZ asked if PAPO was alone, and PAPO replied he was with his cousins "Monono and Mega." SANTOS ORTIZ said he would call PAPO as soon as he got the drugs ("I will call you right away.").

125.    On July 21, 2020, at 11:27 a.m. (call #662), SANTOS ORTIZ called PAPO. SANTOS ORTIZ asked if PAPO was home ("Are you there?"). PAPO said he was out running errands. SANTOS ORTIZ told PAPO to call him when he arrived home because a customer was waiting to purchase drugs ("Call me . . . because someone is waiting for that."). SANTOS ORTIZ said he would send a courier to pick up the drugs from PAPO's ("I might send someone to pick it up."). PAPO apologized and said he would call SANTOS ORTIZ when he returned home ("I'm sorry. I will call you in a little while."). I believe SANTOS ORTIZ needed to get into PAPO's

drug stash location (17 Ellis Street) to pick up drugs he stored there so he could sell those drugs to a customer who was waiting.

126.    On July 22, 2020, at 5:04 p.m. (call #819), SANTOS ORTIZ again called PAPO. SANTOS ORTIZ asked if PAPO was at his "house," and PAPO confirmed he was. SANTOS ORTIZ told PAPO to open the door to the rear of his house ("Open up from the back."). PAPO said he was on "the patio" and told SANTOS ORTIZ to "come over there." As detailed above, investigators saw both SANTOS ORTIZ and MADE leaving 17 Ellis Street after these calls. Investigators also confirmed that 17 Ellis Street has a patio, and have seen Hispanic males on that patio.

### 7.   *BAEZ-ESTRELLA-POLANCO*

127.    BAEZ is extremely surveillance conscious, and cycles through phones and cars to conduct his drug business. Interceptions and physical surveillance show that ESTRELLA and POLANCO work for BAEZ and assist him in distributing drugs. Since this investigation began, ESTRELLA has been stopped two times while transporting drugs for BAEZ. And, on June 17, 2020, he was stopped again by a Massachusetts State Trooper for speeding. Calls intercepted immediately after this call indicate that ESTRELLA ingested the drugs he was delivering to some of BAEZ's customers. As detailed above, POLANCO was stopped while delivering drugs to one of BAEZ's customers, LAGASEE, on August 2, 2020.

    BAEZ sent a courier to deliver drugs to a customer.

128.    On July 23, 2020, at 12:42 p.m., ESTRELLA used Target Telephone #11 to call LAGASEE. During the call, ESTRELLA told LAGASEE that BAEZ was asking LAGASEE if she could double her usual order of drugs and sell it to her customers so he would not have to deliver drugs to her so frequently ("Yeah, yeah. Uh, he say if uh, if you could handle double,

double as that. He wanted me to ask you if you can, if you're not it's fine. He says it's less risk."). LAGASEE agreed ("Yeah, I'm handling it fine. What, what does he wanna know?"). ESTRELLA explained that BAEZ wanted to deliver double her usual order of drugs ("He wanted me to ask you if you can handle it double of that, of what I take over there for you."). LAGASEE agreed ("Yeah! I mean, I don't see why not."). ESTRELLA said that other couriers who worked for BAEZ would deliver drugs to her later that day after 5:00 ("And uh, Okay, I will let him know and then, yeah. The guys will probably go see you after 5:00, okay? So, hang tight and then we'll speak later on, okay?"). Later that day at 6:20 p.m., ESTRELLA used Target Telephone #11 to call LAGASSE. ESTRELLA told LAGASEE that a courier was on his way to deliver drugs to her ("The worker is on the way over there right now. So how's everything?"). LAGASEE asked if the drugs were being delivered already segregated by type ("Did they bring the folder and everything? That's so important. . . . Yes, because everything is all divvied up. You saw how I do it when I bring it back, right?"). ESTRELLA affirmed ("Yes, I told the crew to take the folder and everything."). LAGASEE asked if the couriers would be arriving soon ("So they'll be here in a little bit?"), and ESTRELLA affirmed. At approximately 4:50 p.m., investigators were conducting surveillance in the vicinity of 118 Thoreau Way, Lawrence, Massachusetts.[4] At approximately 5:45 p.m., investigators saw BAEZ, ESTRELLA, and Colon exit 118 Thoreau Way. Colon's Escape and ESTRELLA's Pilot then both left the area. Investigators were also conducting surveillance in the vicinity of LAGASEE's home in New Hampshire (8 Western Avenue, Dover, New Hampshire). At approximately 6:35 p.m., they observed Colon's Escape arrive at LAGASEE's home. POLANCO got out of the passenger seat and entered 8 Western

---

[4] Investigators identified this location earlier in the investigation as being used by BAEZ and his couriers as a possible drug storage location.

Avenue. He was carrying a large box and a bucket when he entered the building. Based on the investigation to date, I believe POLANCO and Colon delivered drugs LAGASEE had ordered from BAEZ and ESTRELLA.

ESTRELLA delivered drugs to customers.

129.    On June 17, 2020, Jacyln Gans was intercepted over Target Telephone #8 ordering drugs from ESTRELLA. During the call, Gans told ESTRELLA that "Caitlin" also wanted drugs ("one"). Based on previous intercepted calls, I believe Gans and Caitlin Durette are drug customers of BAEZ. ESTRELLA was stopped by police while en route driving the Pilot to deliver the drugs to Gans. After the stop, Caitlin Durette used (857) 246-5924 to call Target Telephone #8 and asked ESTRELLA about his time of arrival. ESTRELLA told Durette he had been stopped and had to swallow the drugs ("Yeah, I have to head back home. I had to swallow. I got stopped by a state trooper."). I confirmed that ESTRELLA was indeed stopped by a Massachusetts State Trooper on this date and time for speeding and was driving the Pilot at the time.

130.    On July 23, 2020, at 12:56 p.m., ESTRELLA used Target Telephone #11 to call (617) 388-4797 and speak with an unidentified female ("UF4797"). Based on previous intercepted calls between UF4797 and BAEZ, I believe UF4797 is a drug customer.[5] UF4797 told ESTRELLA she was walking out to meet him ("I'm walking out right now."). ESTRELLA told her to stop at a location and that he would meet her soon and that he was driving a black Honda Pilot ("I'll be right there. I'm parking right there . . . The black Honda Pilot."). The Pilot

---

[5] For example, on June 21, 2020, BAEZ used Target Telephone #8 to call UF4797. UF4797 asked if BAEZ was "going there." BAEZ affirmed and told UF4797 to "text him" and asked, "What do you need?" UF4797 replied that she needed three units of drugs ("three"). BAEZ said he would meet her in "20 minutes." Similarly, on June 12, 2020, UF4797 called Target Telephone #8 and spoke with BAEZ. UF4797 asked if BAEZ was "around." BAEZ said he was and asked what she needed. UF4794 said she needed two or three units of drugs ("two or three").

ESTRELLA has been seen using to transport drugs is black. UF4797 agreed ("I'll be right there."). Footage from a pole camera showed that at 12:21 p.m., ESTRELLA and POLANCO left 274 East Haverhill Street, Lawrence, Massachusetts (BAEZ's residence) in the Pilot. I believe ESTRELLA was using Target Telephone #11 to field drug calls and used the Pilot to deliver drugs to UF4797 and other customers of BAEZ.

131.    On July 25, 2020, UF4797 called Target Telephone #11 and spoke with BAEZ. BAEZ asked if UF4797 was ready to meet ("Are you ready?") and UF4797 affirmed. BAEZ said he was "on his way" and would meet UF4797 in "20 to 25" minutes. Based on the investigation, I believe BAEZ was driving to meet UF4797 to deliver drugs. This meeting was not surveilled by investigators. However, based on the content of the call, I believe BAEZ used a vehicle to meet with and deliver drugs to UF4797.

132.    On July 26, 2020, at 1:35 p.m., UF4797 called Target Telephone #11 and spoke with ESTRELLA. UF4797 asked if ESTRELLA was in the area ("You around?"). ESTRELLA asked, "What you need?" UF4797 replied she needed two or three units of drugs ("Uh, two or three."). ESTRELLA acknowledged ("Okay") and UF4797 asked how long it would take for ESTRELLA to deliver the drugs ("How long you think."). ESTRELLA replied that he was coming ("I'm on my way. Forty minutes."). Based on the investigation to date, I believe ESTRELLA was out delivering drugs to customers, that he had drugs with him, and that he was planning to deliver the drugs UF4797 wanted in 40 minutes.

**Target Locations**

***Description and Criminal Activity at Target Locations***

**(1)  SANTOS ORTIZ's Residence – Target Location #1**

Description of Target Location #1

133.    **41 Lucerne Street, 2nd floor, Apartment 2, Dorchester, Massachusetts ("41 Lucerne Street")** is a multi-family, three-story residential building. The building is yellow in color with white columns and trim. It has a front porch and two balconies facing the parking lot. The main door faces the street. The number "41" is affixed to the first level column to the left of the front door. There appear to be three mailboxes, which are attached to the left side of the entry door. A chain-link fence runs along the front of the property adjacent to the sidewalk. A detailed description and photograph of Target Location #1 is detailed in Attachment A-1, which is attached hereto and incorporated herein by reference.

134.    Based on physical and electronic surveillance and intercepted calls, I believe SANTOS ORTIZ lives at this residence with KATY. Since approximately March 2020, on numerous occasions investigators have seen SANTOS ORTIZ and KATY coming and going from 41 Lucerne Street and sitting on the second floor balcony. Investigators have observed SANTOS ORTIZ on numerous occasions at this location, and vehicles he is known to drive have been parked on the street in the vicinity of 41 Lucerne Street. SANTOS ORTIZ was most recently seen at this location on August 3, 2020. The phone location data for SANTOS ORTIZ's current phone (Target Telephone #10) indicates it is in the vicinity of 41 Lucerne Street most nights and the early morning hours, including most recently as August 4, 2020.

Link to Criminal Activity

135.    As detailed in this affidavit, SANTOS ORTIZ is the leader of a DTO that purchases and distributes large quantities of heroin, cocaine, and fentanyl to a large customer base. SANTOS ORTIZ has been intercepted on a daily basis discussing the acquisition of drugs, the payment of drug debts he owes to his suppliers and drug debts owed to him. SANTOS ORTIZ employees a number of associates to assist him in his large-scale drug distribution business, including couriers and associates who mix and package drugs for him. Since March 2020, SANTOS ORTIZ has been intercepted using at least three different phones during the course of this investigation. As detailed above, investigators seized three kilograms of fentanyl from ORTEGA, which she was transporting on behalf of SANTOS ORTIZ, and approximately 30 fingers of fentanyl from ADELIS, who is one of SANTOS ORTIZ's customers and criminal associates. Accordingly, I believe that evidence of SANTOS ORTIZ's ongoing drug trafficking activities, including drugs, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, and drug proceeds, as set forth in Attachment B, will be found at Target Location #1.

**(2)  CHIMAO's and ISKANIIA's Residence – Target Location #2**

Description of Target Location #2

136.    **6 Castlegate Road, 2nd floor, Apartment #4, Dorchester, Massachusetts ("6 Castlegate Road")** is a red brick four story, multi-unit apartment building. The entry door into the building is brown and is surrounded by white ornate trim. The number "6" is affixed above the entry door on a glass window. A callbox is affixed to the left of the entry door and has the names of residents and their respective apartments. The name associated with Target Location #2 (Apartment #4) is listed as "Mesa-Ramos." Target Location #2 is on the second floor. The door

to apartment 4 is at the bottom of a set of stairs. The door is a six paneled door with a silver door knocker in the middle with a silver "#4" above it. The door and lockset is on the left hand side of the door, which is encased in black trim. A detailed description and photograph appear in Attachment A-2, which is attached hereto and incorporated herein by reference.

137.     Based on physical and electronic surveillance, precise data location for CHIMAO's phone (Target Telephone #7), and intercepted calls, I believe CHIMAO lives at Target Location #2 with his wife, ISKANIIA. Investigators have seen CHIMAO and ISKANIIA coming in and out of 6 Castlegate Road at times that are consistent with them living at that location, most recently on August 3, 2020.  Moreover, the phone location information for Target Telephone #7 indicates it is in the vicinity of Target Location #2 in the nighttime and early morning hours, including as recently as August 4, 2020. CHIMAO has also been intercepted giving the address and apartment number to Target Location #2 to drug customers to pick up drugs. Moreover, the utilities for Target Location #2 are in the name of Andres Mesa-Reyes, who I believe is ISKANIIA's father. The phone number associated with the utilities is the phone number that ISKANIIA has been intercepted over Target Telephone #7 using.

Link to Criminal Activity

138.     As detailed throughout this affidavit, CHIMAO partners with SANTOS ORTIZ and others to acquire and distribute large quantities of heroin, cocaine, and fentanyl to a large customer base. CHIMAO and SANTOS ORTIZ have also been intercepted discussing the logistics of kidnapping ORTEGA and others who they believe either stole drugs from them or owe them money. CHIMAO has been intercepted telling an associate he needed to get his "other" gun to carry with him.  CHIMAO has been intercepted using Target Telephone #7 throughout the investigation, and is known to use other phones (he has been overheard talking on other phones

while using Target Telephone #7). As detailed herein, CHIMAO has sent customers to Target Location #2 to purchase drugs. Accordingly, I believe that evidence of CHIMAO's ongoing drug trafficking activities, including drugs, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, and drug proceeds, as set forth in Attachment B, will be found at Target Location #2.

    **(3)**        **CHIMAO's Drug Storage Location – Target Location #3**

           Description of Target Location #3

139.    **56 Mozart Street, Apartment 2, Jamaica Plain, Massachusetts** ("56 Mozart Street") is a blue vinyl siding three-story, multi-unit residential building. The common entrance is located in front to the left side of the building facing Mozart Street. The entry door is white with a window in the center. The front porch area has two white pillars. There are three mailboxes affixed to the right of the entry door. The number "56" is affixed to the pillar to the right of the front door. Mailbox #2 lists the names Maria Ramos and Jonathan Ramos. A detailed description and photograph appear in Attachment A-3, which is attached hereto and incorporated herein by reference.

140.    I believe Target Location #3 is the residence of ISKANIIA's parents, Andres Reyes and Maria Ramos. The utilities for Target Location #3 are in the name of Maria Ramos, and Maria and Jonathon Ramos's names appear on the mailbox for Apartment #2. I believe Maria Ramos is ISKANIIA's mother and Jonathon Ramos is her brother. CHIMAO and HAMLITO have been intercepted saying they were hanging out at "Maria's." Moreover, on multiple occasions, CHIMAO has said he is going to the "father-in-law's," after which he goes to Target Location #3. CHIMAO and ISKANIIA were last seen at 56 Mozart Street on August 4, 2020. The phone

location data for CHIMAO's phone (Target Telephone #7) last indicated it was in the vicinity of 56 Mozart Street that same day.

Link to Criminal Activity

141.    Based on physical and electronic surveillance, precise location data for phones used by CHIMAO and SANTOS ORTIZ, and intercepted calls, I believe CHIMAO uses Target Location #3 to store drug proceeds and to conduct drug transactions.

142.    On June 12, 2020, at approximately 1:17 p.m., SANTOS ORTIZ was seen parking his vehicle outside of 6 Castlegate Road (Target Location #2) and entering the door to 6 Castlegate Road. Intercepted calls indicated that SANTOS ORTIZ was meeting CHIMAO at Target Location #2 to provide him drugs, which CHIMAO intended to sell to a customer. SANTOS ORTIZ left the location at 1:26 p.m. At 1:45 p.m., CHIMAO, ISKANIIA, and their child exited 6 Castlegate Road. CHIAMO was seen meeting briefly with the driver of a black SUV. In a subsequent call, CHIMAO told SANTOS ORTIZ that the customer did not like the drugs ("Logan did not like the product."). SANTOS ORTIZ said he would "tighten" the drugs to make them hard. SANTOS ORTIZ said he would take the drugs to "Hyde Park" (presumably to Target Location #4). At approximately 1:50 p.m., CHIMAO and ISKANIIA left 6 Castlegate Road. At 1:51 p.m., SANTOS ORTIZ called PAPO and said he needed to "put 100 pesos tight." PAPO told him to "go alone" and someone would be there to fix the drugs. At 2:17 p.m., SANTOS ORTIZ called CHIMAO and said he was "down there" and to open the door ("open up"). At 2:25 p.m., investigators arrived at 56 Mozart Street and observed both SANTOS ORTIZ's and CHIMAO's vehicles parked in the driveway of 56 Mozart Street. At 2:32 p.m., both vehicles left. CHIMAO was driving ISKANIIA's Lexus, and SANTOS ORTIZ was driving his rental car (a Kia). I believe

SANTOS ORTIZ and CHIMAO went to Target Location #3 to pick up the drugs from CHIMAO

so he could take them to Target Location #4 for PAPO to remix and press the drugs.

143.    As detailed above, on June 14, 2020, CHIMAO told SANTOS ORTIZ he had

$10,000 stored at his "father-in-law's," which he intended to use to purchase drugs with SANTOS

ORTIZ. I believe CHIMAO was referring to Target Location #3 as the location where he had his

drug proceeds stored.

144.    In addition, on June 8, 2020, investigators intercepted calls over Target Telephones

#5 and #7 (#2776 and #889) between CHIMAO and SANTOS ORTIZ indicating that SANTOS

ORTIZ was using a Lexus vehicle as collateral for an outstanding $7,000 drug debt he owed to

CHIMAO. At approximately 2:50 p.m. that day, location data for Target Telephone #7 indicated

it was at Target Location #3. At approximately the same time, investigators observed SANTOS

ORTIZ driving the Lexus and parking across from Target Location #3. A vehicle known to be

used by CHIMAO (an Infiniti sedan, bearing MA registration 3SMZ11) was parked in front of

Target Location #3. At approximately 2:51 p.m., SANTOS ORTIZ called CHIMAO (call #2800

and #930) and said he had arrived and asked in which driveway he should park the vehicle.

CHIMAO told SANTOS ORTIZ he would be "right out." Investigators could not stop to observe

the meeting without compromising their surveillance.

145.    Based on the investigation to date, CHIMAO's long-term involvement in drug

trafficking, the fact that he has used Target Location #3 to facilitate his drug trafficking business,

and the fact that he said he stored money at this location, I believe there is probable cause to

believe that evidence of CHIMAO's ongoing drug trafficking activities, including drugs, drug

proceeds, drug ledgers, and records of drug trafficking, as set forth in Attachment B, will be found

at Target Location #3.

(4)     **SANTOS ORTIZ's drug stash location – Target Location #4**

Description of Target Location #4

146.     **17 Ellis Street, Hyde Park, Massachusetts** is a blue vinyl siding two-story, two family dwelling. The common entrance is located in front to the left side of the dwelling facing Ellis Street. The entry door is blue and encased in white trim, and contains a half-moon window which is located at the top of the door. Located below the half-moon window is the number "17," which appears to be made of brass and affixed to the entry door. The front porch area has five white support columns, a white vinyl railing, and three standard windows. The support column located to the left of the entry door also displays the number "17," which has been affixed to the column. There is one mailbox affixed to the right of the entry door, and located directly above the mailbox is a placard style sign that reads, "Warning security cameras in use." A detailed description and photograph of Target Location #4 appear in Attachment A-4, which is attached hereto and incorporated herein by reference.

147.     Intercepted calls indicate that SANTOS ORTIZ employs a number of people to mix and package drugs for him, including PAPO and PAPO's cousin, Mega. Based on these calls, I believe PAPO stores drugs for SANTOS ORTIZ at Target Location #4, which he maintains as a place to mix and package drugs. Investigators believe PAPO, MADE, SANTOS ORTIZ and others use 17 Ellis Street as a location to mix, package and store drugs and to store money, based on intercepted calls indicating that SANTOS ORTIZ was going to PAPO's, physical surveillance that has placed SANTOS ORTIZ at that location at times when the location data for SANTOS ORTIZ's phone indicated it was in the vicinity of 17 Ellis Street, and other physical surveillance observations as detailed herein. The precise location data for PAPO's phone has indicated that the phone is at this location on a daily basis. Moreover, investigators have seen PAPO and his vehicle

(which is registered to MADE) at this location on numerous occasions, most recently on August 4, 2020.

Link to Criminal Activity

148.    On July 18, 2020, at 5:20 p.m. (call #244), PAPO used telephone number (857) 346-9128 to call SANTOS ORTIZ. The call was intercepted over Target Telephone #10. SANTOS ORTIZ said he was waiting for a supplier to sell him 500 grams of drugs ("I'm still waiting for the guy . . . get like 500 to add something."). PAPO told SANTOS ORTIZ to let him know when he was ready to mix or press the drugs ("Let me know when you are ready."). SANTOS ORTIZ asked if PAPO was alone, and PAPO replied he was with his cousins "Monono and Mega." SANTOS ORTIZ said he would call PAPO as soon as he got the drugs ("I will call you right away.").

149.    On July 21, 2020, at 11:27 a.m. (call #662), SANTOS ORTIZ used Target Telephone #10 to call PAPO. SANTOS ORTIZ asked if PAPO was at the drug stash location ("Are you there?"). PAPO said he was out running errands. SANTOS ORTIZ told PAPO to call him when he arrived home because a customer was waiting to purchase drugs ("Call me . . . because someone is waiting for that."). SANTOS ORTIZ said he would send a courier to pick up the drugs from PAPO's ("I might send someone to pick it up."). PAPO apologized and said he would call SANTOS ORTIZ when he returned home ("I'm sorry. I will call you in a little while."). I believe SANTOS ORTIZ needed to get into Target Location #4 to pick up drugs he stored there so he could sell those drugs to a customer who was waiting.

150.    As detailed above, on July 22, 2020, at 5:04 p.m. (call #819), SANTOS ORTIZ used Target Telephone #10 to call PAPO. SANTOS ORTIZ asked if PAPO was at his "house," and PAPO confirmed he was. SANTOS ORTIZ told PAPO to open the door to the rear of his

house ("Open up from the back."). PAPO said he was on "the patio" and told SANTOS ORTIZ to "come over there." As detailed above, investigators saw both SANTOS ORTIZ and MADE leaving 17 Ellis Street after these calls. Investigators also confirmed that 17 Ellis Street has a rear patio, and have seen Hispanic males on that patio.

151.    Based on the investigation to date, PAPO's, SANTOS ORTIZ's, and MADE's long-term involvement in drug trafficking, and the money and drug seizures from members of the targeted DTO during the course of this investigation, I believe there is probable cause to believe that evidence of SANTOS ORTIZ's, MADE's, and PAPO's ongoing drug trafficking activities, including drugs, materials used to mix drugs, drug packaging materials, and drug proceeds, as set forth in Attachment B, will be found at Target Location #4.

### (5)  CHIMAO's drug stash location/Cunao's Residence – Target Location #5

Description of Target Location #5

152.    **Soma Apartments, 785 Cummins Hwy, Apartment 2, Mattapan, Massachusetts** ("Soma Apartments") is described as a tan colored brick apartment building containing multiple units, located at the corner of Cummins Highway and Bismark Street in the Mattapan section of Boston. 785 Cummins Highway is part of the Soma Apartments complex, and is accessible by front, side and rear entry doors. The front entry door is made of glass and contains two full length side glass panels. Located on the left side glass panel is a silver colored call box containing numbers "0" through "9", "#," and "*." Directly above the entry door is a red colored brick prominently displaying the number "785," which is silver in color and affixed to the red colored brick. Apartment 2, the Target Location, is located in the basement of the building next to the laundry room. The entry door to Apartment 2 is brown with brown casing, and contains a gold tone knob and lock set, and a door viewer. Directly above the door viewer is the number

"2," which is made of brass and in gold tone, and is prominently displayed and affixed to the entry door. A detailed description and photograph of Target Location #5 appear in Attachment A-5, which is attached hereto and incorporated herein by reference.

153.    I believe Cunao resides at Target Location #5 and that CHIMAO stores drugs at this location. I believe Cuano lives in Target Location #5 (Apartment 2) because the apartment is leased by Andres Reyes, CHIMAO's father-in-law and ISKANIIA's father. CHIMAO, HAMLITO, and SANTOS ORTIZ have all referred to drugs being stored by Cunao, which in Spanish means brother-in-law. Moreover, as detailed below, CHIMAO has been intercepted telling drug customers to meet at his location to conduct drug transactions and HAMLITO has been seen conducting hand-to-hand transactions outside of Target Location #5. CHIMAO, HAMLITO, and Cunao have all been seen together at this location, most recently on August 4, 2020. The location data for CHIMAO's and HAMLITO's phones also indicated they were in the area of Target Location #5 that same day. As further detailed below, HAMLITO went to Target Location #5 on August 5, 2020, prior to selling drugs to a customer of CHIMAO's.

Link to Criminal Activity

154.    On June 13, 2020, at 1:36 p.m. (call #1154), CHIMAO called (978) 641-9095 and spoke with Cunao. CHIMAO asked how many units of drugs Cunao had on hand ("How many are there now?"), and Cunao replied, "Four." CHIMAO said he needed "1.5" so that HAMLITO could pick it up. Cunao said he was not home at the time, but would be there in 10-15 minutes. I believe CHIMAO asked Cunao to prepare 1 and ½ fingers of fentanyl, that HAMLITO was going to pick up the drugs, and Cunao had the drugs stored at his residence, Target Location #5.

155.    On June 19, 2020, at approximately 8:23 p.m. (call #1381), CHIMAO called (857) 507-5812 and spoke with an unidentified male ("UM5812"). The call was intercepted over Target

Telephone #7. CHIMAO told UM5812 that someone had given CHIMAO drugs or drug proceeds to deliver to UM5812 ("They gave me to give to you."). CHIMAO said he was in "Boston," and UM5812 asked if they could meet the following day ("Can I go pick it up tomorrow?"). CHIMAO agreed, but said if UM5812 could meet that day, he could give him the drugs or drug proceeds ("No problem . . . If you could go today, I'll give it to you right away."). UM5812 said he would try to find someone to drive him to meet CHIMAO ("If there's somebody to take me today I'll go, but if not I'll go early tomorrow."). Later, at approximately 9:01 p.m. (call #1384), UM5812 called CHIMAO. UM5812 asked if he should "call or text" CHIMAO. CHIMAO told UM5812 to call when he was nearby and that CHIMAO would meet him and deliver the drugs or drug proceeds ("Call me when you're in the area and I will go to meet you and hand it over."). At 9:39 p.m. (call #1386), UM5812 called CHIMAO. CHIMAO explained he did not know whether he was meeting UM5812 in "Dorchester or Hyde Park." UM5812 said the address was in Mattapan and would send CHIMAO the address ("It's in Mattapan. I will send the address."). At 9:40 p.m. (call #1388), UM5812 sent CHIMAO a text with the address ("785 Cummins hwy Mattapan."), indicating he had been to this address before. At 10:04 p.m. (call #1393), UM5812 called CHIMAO. UM5812 explained his location ("I'm in the big buildings around there . . . condominiums."). CHIMAO directed UM5812 to his location and said he would wait for him ("I will wait outside just in case you get lost. You can enter."). Based on the intercepted calls, I believe CHIMAO met with UM5812 at Target Location #5 to deliver drugs or drug proceeds to UM5812.

156.    On July 2, 2020, at 2:19 p.m., investigators saw HAMLITO leave the Soma Apartments complex driving his BMW. Surveillance units followed the BMW to the area of 214-218 Florence Street in Roslindale. An unidentified male approached the driver's seat area of the

BMW and made contact with HAMLITO. Shortly thereafter, HAMLITO left the area, and the unidentified male returned to a vehicle and placed an item inside the vehicle. I believe this was a hand-to-hand exchange of drugs.

157.    Later that evening, at 8:34 p.m., investigators intercepted a call between CHIMAO and HAMLITO over Target Telephone #7, discussing how long before a person (believed to be a drug customer) would be arriving. At the time, the BMW was outside of the Soma Apartments. A couple of minutes later, CHIMAO called HAMLITO and said the customer had arrived and was parking ("She's parking."). At 8:47 p.m., investigators saw a female get out of the passenger seat of the BMW. The female got into a car with New Hampshire license plates and left the area. I know from my training and experience that drug users from New Hampshire often come to Massachusetts to purchase drugs. I believe HAMLITO sold drugs to the female.

158.    On July 7, 2020, at 2:49 p.m. (call #2294), CHIMAO called Target Telephone #10 and spoke with SANTOS ORTIZ. The call was intercepted over Target Telephone #7. CHIMAO told SANTOS ORTIZ to go to Target Location #5 ("Head down to Cummins to meet. That way I don't have to head up there."). SANTOS ORTIZ asked where the apartment was located ("Where is that?"). CHIMAO replied, "On Cummins. You know, the apartments." SANTOS ORTIZ agreed ("Oh. Down there? . . . Alright.").

159.    As detailed above, on August 5, 2020, investigators intercepted calls between CHIMAO and HAMLITO in which CHIMAO informed HAMLITO that customer was traveling to the area to pick up drugs. The GPS tracking device installed on HAMLITO's BMW indicated it left his residence (Target Location #10) and traveled to the vicinity of the Soma Apartments. At approximately 12:20 p.m., investigators saw HAMLITO in his BMW drive into the parking lot outside of Target Location #5. At approximately 12:30 p.m., a vehicle with New Hampshire

license plates arrived and parked a block away from Target Location #5. HAMLITO drove his BMW and parked behind the New Hampshire vehicle. A white male got out of the New Hampshire vehicle and approached the BMW's passenger-side window. The male reached into the BMW and then walked back to the New Hampshire vehicle clenching an object in his fist. Investigators directed MSP to stop the New Hampshire vehicle. A trooper stopped the vehicle as it traveled back towards the highway. The occupants of the vehicle included the white male who was observed meeting with HAMLITO. After questioning, a female seated in the back seat handed over one and a half fingers of a substance that field tested positive for fentanyl. In a call intercepted prior to the transaction, CHIMAO told HAMLITO that he would "head over there." The location data for CHIMAO's phone indicated it was in the vicinity of Target Location #5 at approximately 1:49 p.m. Based on the investigation to date, I believe HAMLITO retrieved the fentanyl that he sold to the occupants of the New Hampshire vehicle from Target Location #5.

160.    Based on the investigation to date, CHIMAO's long-term involvement in drug trafficking, intercepted calls that indicate CHIMAO, HAMLITO, and Cunao use this location to store and mix drugs, and physical and electronic surveillance observations detailed herein, I believe there is probable cause to believe that evidence of CHIMAO's ongoing drug trafficking activities, including drugs, materials used to mix and package drugs, drug ledgers and records, and drug proceeds, as set forth in Attachment B, will be found at Target Location #5.

### (6)    BAEZ's Residence – Target Location #6

Description of Target Location #6

161.    **274 East Haverhill Street, Lawrence, Apartment 14, Massachusetts Massachusetts ("274 East Haverhill")** is a multi-unit, three level brick, apartment complex, with decks on either side of the entry door. There are two cement stairs with black railings on either

side leading up to a glass door with the number "274" written in the middle of the glass entry door in white writing. Below the number "274" is a no soliciting sign. The door handle is on the left hand side. There are two lights on either side of the door and a firefighter key lock box on the building to the left of the entry door. A detailed description and photograph of Target Location #6 appear in Attachment A-6, which is attached hereto and incorporated herein by reference.

162.     As detailed in this affidavit, I believe BAEZ resides among Target Locations #6, #7, and #8, and that he and ESTRELLA and POLANCO store drugs and/or drug proceeds at all of these locations. CHIMAO was intercepted discussing how he had kidnapped BAEZ, because BAEZ allegedly had stolen 15 kilograms of drugs from CHIMAO. I believe BAEZ splits his time among Target Locations #6, #7, and #8 because he is leery about being kidnapped again and to avoid law enforcement detection. I also believe he stores his drugs/drug proceeds at each of these locations to avoid being robbed or caught with large amounts of drugs.

163.     Based on recent surveillance observations, I believe POLANCO is staying at Target Location #6. I believe BAEZ maintains Target Location #6 (Apartment 14, specifically) because on August 6, 2020, at 12:08 a.m., investigators used a cell-site simulator to locate POLANCO's phone, pursuant to a warrant. The information obtained from the cell-site simulator confirmed that POLANCO's phone was inside of Apartment 14. Moreover, POLANCO gave the address of 274 East Haverhill Street to troopers when he was stopped transporting drugs on August 2, 2020. BAEZ and POLANCO were last seen at Target Location #6 on August 2, 2020, prior to POLANCO being stopped. The data location information for BAEZ's phone (Target Telephone #9) also indicates it was in the vicinity of Target Location #6 on August 2, 2020.

**BAEZ and ESTRELLA left Target Location #6 to deliver drugs to a customer.**

164.    On June 15, 2020, at approximately 2:04 p.m. (call #568), BAEZ received an incoming call over Target Telephone #8 from (978) 601-3487, which is believed to be used by Jaclyn Gans. Based on prior intercepted calls, I believe Gans is a drug customer of BAEZ.  Gans told BAEZ where she was located ("40 West Cedar Street"), and BAEZ agreed to meet her at a flower shop near that address. At approximately 2:30 p.m., investigators saw a vehicle (that had been rented by BAEZ) parked near 274 East Haverhill Street. Investigators saw BAEZ walking toward the vehicle along with ESTRELLA. At approximately 3:00 p.m., investigators saw Gans exit the flower shop near 40 West Cedar Street and get into the rear passenger's seat of the vehicle. A  Hispanic male believed to be BAEZ was driving the vehicle and ESTRELLA was in the front passenger seat. The vehicle drove around for a few minutes, before Gans got out of the vehicle and reentered the flower shop. Based on the investigation to date, I believe BAEZ and ESTRELLA delivered drugs to Gans, which had been stored at Target Location #6.

165.    As detailed above, on July 23, 2020, at 12:56 p.m., ESTRELLA used Target Telephone #11 to call (617) 388-4797 and speak with UF4797, one of BAEZ's drug customers. UF4797 told ESTRELLA she was walking out to meet him ("I'm walking out right now."). ESTRELLA told her to stop at a location and that he would meet her soon and that he was driving a black Honda Pilot ("I'll be right there. I'm parking right there . . . The black Honda Pilot."). As detailed above, ESTRELLA has used his black Pilot to deliver drugs to customers. UF4797 agreed ("I'll be right there."). Footage from a pole camera showed that at 12:21 p.m., ESTRELLA and POLANCO left 274 East Haverhill in the Pilot. Based on the investigation to date, I believe ESTRELLA was using Target Telephone #11 to field drug calls, picked up drugs from Target Location #6, and used the Pilot to deliver drugs to UF4797.

166.     On July 19, 2020, at 9:36 p.m. (call #271), BAEZ received an incoming call over Target Telephone #9 from (978) 242-2379 and spoke with an unidentified male ("UM2379"). UM2379 asked if something had arrived ("Did it arrive okay."), and BAEZ affirmed and asked if UM2379 was at a location ("Yes, everything good. Did you find the key?"). UM2379 said he was in Lawrence ("Yes, I'm arriving in Lawrence now."). UM2379 asked if he should leave the item ("Should I leave it like that?"), and BAEZ agreed and told UM2379 not to say anything about the item ("Yes, leave it like that and don't show anything to anyone."). UM2379 agreed ("No, no, no. Don't worry. I didn't say anything. I didn't show anyone anything."). BAEZ again repeated that UM2379 should not "show anyone" what had arrived. BAEZ and UM2379 agreed to meet at a location. Based on the investigation to date, I believe the item that arrived was drugs and that UM2379 brought the drugs to a storage location in Lawrence that is maintained by BAEZ.

Investigators seize drugs from that BAEZ sent to LAGASEE.

167.     As detailed above, on July 31, 2020, investigators intercepted a series of calls and text messages over Target Telephone #11 indicating that LAGASEE had ordered drugs and that BAEZ was having those drugs delivered to her. On August 2, 2020, at 1:49 p.m., ESTRELLA confirmed that the drugs were being delivered. At approximately 3:40 p.m., investigators established surveillance at locations in Lawrence frequented by the BAEZ, ESTRELLA, and POLANCO. At approximately 6:32 p.m. surveillance observed both the Escape and a Ford Explorer (registered to ESTRELLA) arrive at 274 East Haverhill. Location data for Target Telephone #9 showed that it was in the vicinity of 274 East Haverhill. At approximately 6:42 p.m., location data from the GPS device attached to the Escape indicated it was in the area of 118 Thoreau Way in Lawrence (Target Location #8). A short time later, the Escape was observed arriving at 118 Thoreau Way being driven by Leomary Colon, the registered owner. At

approximately 6:52, ESTRELLA's Explorer arrived at 118 Thoreau Way. Investigators saw BAEZ and Colon enter 118 Thoreau Way and then exit a short time later. At approximately 6:58 p.m., the Escape and Explorer departed the parking lot. Surveillance was maintained on the Escape. The Escape then traveled to 274 East Haverhill, stopped for a brief period of time, and then departed the lot and headed to Route 95. I believe Colon returned to 274 East Haverhill to pick up POLANCO. At approximately 6:59 p.m., BAEZ called LAGASEE indicating he was on his way. Investigators coordinated with the New Hampshire State Police ("NHSP") to conduct a motor vehicle stop of the Escape. As detailed above, NHSP stopped the Escape, which Colon and POLANCO were driving, and seized drugs from the vehicle. Before being released, POLANCO gave the trooper the phone number (857) 204-9202 as his contact number.

168.    Based on the investigation to date, BAEZ's long-term involvement in drug trafficking, the fact that investigators observed ESTRELLA conduct an apparent drug transaction (which was corroborated by intercepted calls) after ESTRELLA and BAEZ left 274 East Haverhill, and that Colon and POLANCO left from this location prior to having drugs seized from them, I believe there is probable cause to believe that evidence of BAEZ's ongoing drug trafficking activities, including drugs, drug ledgers and records, phones used to conduct his drug business, and drug proceeds, as set forth in Attachment B, will be found at Target Location #6.

   **(7)    BAEZ's Residence/Drug Storage Location (Target Location #7)**

   Description of Target Location #7

169.    **103 River Pointe Way, Apartment 2304, Lawrence, Massachusetts** ("103 River Pointe Way") is a three-story, multi-unit apartment complex with beige colored siding, white trim, and a stone façade on the lower level. The front side of 103 River Pointe Way consists of a common parking area, and the rear side consists of conservation land. 103 River Pointe Way is

accessible by front and rear entry doors, which are accessible to all residents residing within the complex. Apartment "2304" (Target Location #7) is located on the second level of building 103 and is accessed by a black colored entry door containing a brass knob and lock set, a brass door knocker, and a brass plate containing the number "2304," which is prominently displayed on the center upper section of the door. A detailed description and photograph of Target Location #7 appear in Attachment A-7, which is attached hereto and incorporated herein by reference.

170.    I believe BAEZ is currently residing at Target Location #7 because the location data for his phone indicates it is in the vicinity of Target Location #7 on a near nightly basis. Moreover, the address 103 River Pointe Way, Apartment 2305 is listed as BAEZ's residence on his Massachusetts driver's license.[6] On July 14, 2020, BAEZ was observed exiting Building 103 (which is the building within which Target Location #7 is located). Moreover, vehicles known to be used by BAEZ or his couriers, ESTRELLA, Colon, and POLANCO, are commonly parked in the parking lot at this location, most recently on August 6, 2020 at approximately 1:20 a.m. On August 6, 2020, at approximately 1:20 a.m., investigators used a cell-site simulator to locate BAEZ's phone, pursuant to a warrant. The cell-site simulator indicated that his phone was inside of Target Location #7 (Apartment 2304).

Link to Criminal Activity

---

[6] The lease information for Target Location #7 indicates it was rented on June 19, 2020 by Iris Santos Betancourt, date of birth November 12, 1971, with Massachusetts driver's license number S64885214. A query of the Massachusetts Registry of Motor Vehicles database shows this is not a valid driver's license. A query of available commercial indices revealed that the name and date of birth of the person used to rent the apartment belong to a Puerto Rican woman, who is currently residing in Canovanas, Puerto Rico. I believe BAEZ used this person's name and information to rent Target Location #7 to insulate himself from the drug trafficking evidence that is stored in this location. Moreover, I believe he intentionally identified his apartment number incorrectly on his driver's license to distance himself from his true address. The actual occupant of Apartment 2305 (the apartment listed on BAEZ's license) is a female who has no known connections to BAEZ or this investigation.

171.     Based on the investigation to date, BAEZ's long-term involvement in drug trafficking, and the money and drug seizures from his couriers and associates during the course of this investigation, I believe there is probable cause to believe that evidence of BAEZ's ongoing drug trafficking activities, including phones used to conduct his drug trafficking activities, drug records, drug proceeds, as set forth in Attachment B-1, will be found at Target Location #7.

**(8)     BAEZ's Residence/Drug Storage Location – Target Location #8**

Description of Target Location #8

172.     **118 Thoreau Way, Apartment 615, Lawrence, Massachusetts** ("118 Thoreau Way") is a multi-unit apartment complex that is beige in color. The entry door to Apartment 615 (Target Location #8) is a six paneled red door, with a silver door handle. There is a brass door knocker in the middle of the door with a black sign bearing the white numbers "615." The door is encased in beige trim with a white light on the upper right hand side on the wall. A detailed description and photograph of Target Location #8 appear in Attachment A-8, which is attached hereto and incorporated herein by reference.

173.     I believe ESTRELLA and BAEZ reside at this location at times. Both ESTRELLA and BAEZ receive U.S. mail at Target Location #8. ESTRELLA and BAEZ were seen at this location most recently on July 23, 2020. BAEZ and ESTRELLA's Explorer were most recently seen at 118 Thoreau Way on August 2, 2020. Based on the investigation to date, I believe BAEZ stores drugs and drug proceeds at this location.

Link to Criminal Activity

BAEZ sent ESTRELLA to deliver drugs to a customer.

174.     On July 23, 2020, at 12:42 p.m., ESTRELLA used Target Telephone #11 to call LAGASEE. During the call, ESTRELLA told LAGASEE that BAEZ was asking if LAGASEE if

she could double her usual order of drugs and sell it to her customers so he would not have to deliver drugs to her so frequently ("Yeah, yeah. Uh, he say if uh, if you could handle double, double as that. He wanted me to ask you if you can, if you're not it's fine. He says it's less risk."). LAGASEE agreed ("Yeah, I'm handling it fine. What, what does he wanna know?"). ESTRELLA explained that BAEZ wanted to deliver double her usual order of drugs ("He wanted me to ask you if you can handle it double of that, of what I take over there for you."). LAGASEE agreed ("Yeah! I mean, I don't see why not."). ESTRELLA said that other couriers who worked for BAEZ would deliver drugs to her later that day after 5:00 ("And uh, Okay, I will let him know and then, yeah. The guys will probably go see you after 5:00, okay? So, hang tight and then we'll speak later on, okay?"). Later that day at 6:20 p.m., ESTRELLA used Target Telephone #11 to call LAGASEE. ESTRELLA told LAGASEE that a courier was on his way to deliver drugs to her ("The worker is on the way over there right now. So how's everything?"). LAGASEE asked if the drugs were being delivered already segregated by type ("Did they bring the folder and everything? That's so important. . . . Yes, because everything is all divvied up. You saw how I do it when I bring it back, right?"). ESTRELLA affirmed ("Yes, I told the crew to take the folder and everything."). LAGASEE asked if the couriers would be arriving soon ("So they'll be here in a little bit?"), and ESTRELLA affirmed. At approximately 4:50 p.m., investigators were conducting surveillance in the vicinity of 118 Thoreau Way, Lawrence, Massachusetts. Two vehicles known to be used by BAEZ and ESTRELLA were both at the location: Colon's Escape and ESTRELLA's Pilot. Investigators saw both BAEZ and ESTRELLA exit 118 Thoreau Way at approximately 5:45 p.m. The Escape and Pilot left the area. Investigators were also conducting surveillance in the vicinity of LAGASEE's home in New Hampshire (8 Western Avenue, Dover, New Hampshire). At approximately 6:35 p.m., they observed the Escape arrive at LAGASEE's

home. POLANCO got out of the passenger seat and entered 8 Western Avenue. He was carrying a large box and a bucket when he entered the building. Based on the investigation to date, I believe POLANCO delivered drugs LAGASEE had ordered from BAEZ and ESTRELLA, and that the drugs POLANCO delivered had been stored at Target Location #8.

175.    Moreover, as detailed above, on August 2, 2020, ESTRELLA's vehicle (the Explorer), BAEZ, and Colon were all seen at 118 Thoreau Way prior to Colon and POLANCO being stopped while transporting drugs to LAGASEE. I believe those drugs were picked up at Target Location #8.

176.    Accordingly, I believe I believe there is probable cause to believe that evidence of BAEZ's, ESTRELLA's, and POLANCO's ongoing drug trafficking activities, including drugs, phones used to conduct their drug trafficking activities, drug records, and drug proceeds, as set forth in Attachment B, will be found at Target Location #8.

**(9)      MADE's Residence – Target Location #9**

Description of Target Location #9

177.    **63 Vallar Road, East Boston, Massachusetts** ("63 Vallar Road") is an apartment, located in a multi-unit housing project. The building has white clapboard shingles, with three cement steps with black railings on either side leading to a green front door with a six paneled square window at the top of the door. The number "63" is affixed to the left side of the door with a light above it. There is a square overhang over the front door, with two support columns on either side and brown accent siding above the overhang with a white square window. A detailed description and photograph of Target Location #9 appear in Attachment A-9, which is attached hereto and incorporated herein by reference.

178.    I believe MADE resides at this location. MADE recently updated his residence with the RMV to list Target Location #9 as his residence. MADE was last seen exiting the front door to Target Location #9 on July 25, 2020. Additionally, investigators installed a GPS tracking device on MADE's car in the early morning hours of July 29, 2020. The car was parked in the vicinity of Target Location #9 at the time it was installed. Precise location information for MADE's cellular telephone also indicates it is frequently in the area of Target Location #9 in the late evening and early morning hours, including most recently on August 4, 2020.

Link to Criminal Activity

179.    As detailed herein, MADE has been intercepted numerous times using at least four different phones to discuss drug transactions and drug debts with SANTOS ORTIZ. Investigators have seen MADE with SANTOS ORTIZ at 17 Ellis Street (Target Location #4) multiple times, most recently on August 3, 2020. Moreover, the vehicle that investigators have seen PAPO driving is registered to MADE. Accordingly, I believe evidence of MADE's drug trafficking activities, including drug ledgers and records, records of collecting drug debts and laundering drug proceeds, drug proceeds, phones used by MADE in furtherance of drug trafficking, and records relating to vehicles he uses and maintains to conduct his drug trafficking activities, as further detailed in Attachment B-1, will be found at Target Location #9.

**(10) HAMLITO's Residence – Target Location #10**

Description of Target Location #10

180.    **37 Cheever Street, Milton, Massachusetts** ("37 Cheever Street") is a two story, single family residence with yellow siding and white trim. The front entry door is located on the front porch area of the residence and is a white door with a brass door knob and lock set, a brass mail slot on the center lower section, and four glass panels on the upper section. The front porch

contains four support columns, white in color, three standard double-hung windows, and an exterior light, which is black. Located directly below the exterior light, the number "37" is prominently displayed in black and is visible from the street. A detailed description and photograph of Target Location #10 appear in Attachment A-10, which is attached hereto and incorporated herein by reference.

181.    Investigators have observed HAMLITO coming into and out of Target Location #10 at times and with the frequency that indicate he resides at this location.  HAMLITO has been seen at Target Location #10 as recently as August 3, 2020. The utilities for Target Location #10 are listed in the name of, "1 Unit, Perez Ruiz Real Estate Investment Associates LLC," and the billing name and address is listed as "Alex R Perez Baez Manager – 31 Cheever Street, Milton, Massachusetts. The BMW used by HAMLITO is in the name of Luis Enrique Arias Perez.  Precise location information for HAMLITO's phone indicates it is in the vicinity of Target Location #10 late at night and in the early morning hours, and the GPS tracking device attached to HAMLITO's BMW show it is parked in the vicinity of Target Location #10 during nighttime hours. The location data from the GPS device installed on HAMLITO's BMW indicated it was most recently in the vicinity of Target Location #10 on August 4, 2020.

Link to Criminal Activity

182.    As detailed above, HAMLITO has been intercepted numerous times discussing drug transactions with CHIMAO. Those calls and physical surveillance indicate that HAMLITO distributes drugs for CHIMAO and to his own customer base. As detailed above, on August 5, 2020, investigators seized approximately 15 grams of suspected fentanyl from a female who had just been seen meeting with HAMLITO. Accordingly, I believe there is probable cause that evidence of HAMLITO's ongoing drug trafficking activities, including phones used to conduct his

drug business, ledgers documenting drug transactions and outstanding debts, drug proceeds, and other evidence set forth in Attachment B-1, will be found at Target Location #10.

**(11)  ADELIS's Residence – Target Location #11**

Description of Target Location #11

183.   **6 Alden Court, Apartment #2, Lawrence, Massachusetts** ("6 Alden Court") is a three story, multi-family dwelling with blue vinyl siding and white trim. The building contains three separate apartments. The front entry door to 6 Alden Court is a common entry door, which grants access to three apartments via an interior stairway and apartment entry doors. The main entry door is white in color with no identifiable markings. One mailbox, black in color bearing a gold emblem, is located directly next to the main entry door on the right. Target Location #11 is Apartment #2, which is located on the second level of 6 Alden Court. A detailed description and photograph of Target Location #11 appear in Attachment A-11, which is attached hereto and incorporated herein by reference.

184.   I believe Target Location #11 is ADELIS's residence because investigators have observed her on multiple occasions at Target Location #11, and the location data for ADELIS's phone indicates it is in the vicinity of Target Location #11 in nighttime and early morning hours. ADELIS's Massachusetts driver's license also lists Target Location #11 as her address (6 Alden Court, Apartment 2, Lawrence, Massachusetts).

Link to Criminal Activity

185.   As detailed above, on August 3, 2020, the GPS tracking device installed on ADELIS's Cherokee indicated it was leaving from 6 Alden Court. After making a couple of random stops, the Cherokee began traveling northbound towards New Hampshire. Based on prior intercepted calls, investigators knew that ADELIS often delivers drugs to customers in New

Hampshire. Investigators believed ADELIS was traveling to New Hampshire to deliver drugs. Investigators directed the NHSP to stop the Cherokee, which they did after observing ADELIS driving the Cherokee traveling 75/80 mph in a 55 mph zone. ADELIS consented to a search of her vehicle, and a trooper found suspected cocaine in a potato chip container inside the vehicle. After further questioning, ADELIS admitted to having additional drugs secreted in her underpants. ADELIS removed 30 fingers of suspected fentanyl from her underpants and gave them to the trooper. I believe ADELIS had the fentanyl stored at her residence prior to attempting to make the deliveries to her customers.

186.    Based on the investigation to date, ADELIS's ongoing involvement in drug trafficking, I believe there is probable cause to believe that evidence of ADELIS's ongoing involvement in the charged drug trafficking conspiracy, including drugs, drug proceeds, phones used to conduct drug business, the names and addresses of customers, and other evidence set forth in Attachment B, will be found at Target Location #11.

### (12) **LARA-CANDELARIO's Residence – Target Location #12**

Description of Target Location #12

187.    **46 Norton Street, Apartment 2, Dorchester, Massachusetts** ("46 Norton Street") is a three story, three family dwelling with white vinyl siding and white trim. The main entry door is located on the front porch area of the residence, which is white in color with the number "46" displayed directly above the door. Located directly to the right of the main entry door is a doorbell/call box, silver in color, and a mailbox unit that contains three separate boxes. Displayed directly above the mailbox unit is a "No Trespass" sign and a sign that states, "Security cameras in use." The main entrance is a common entry door which leads to all apartments. Each story contains a door that leads to an exterior deck, which does not access the street. Target Location

#12 is Apartment 2. A detailed description and photograph of Target Location #12 appear in Attachment A-12, which is attached hereto and incorporated herein by reference.

188.    I believe LARA-CANDELARIO resides at Target Location #12 because the location is listed as her residence on her Massachusetts driver's license. Investigators have seen LARA-CANDELARIO or her vehicle at this location on numerous occasions, most recently on August 6, 2020.

Link to Criminal Activity

189.    As detailed above, on July 21, 2020, investigators intercepted calls between SANTOS ORTIZ and LARA-CANDELARIO indicating that he was having six kilograms of drugs delivered to her residence. LARA-CANDELARIO told SANTOS ORTIZ that he should not send drugs to her residence without first telling her, because her landlord had picked up the package of drugs and examined it. Moreover, on the night that SANTOS ORTIZ and CHIMAO plotted to kidnap ORTEGA, they met at LARA-CANDELARIO's residence to formulate the plan.

190.    Accordingly, I believe that evidence of LARA-CANDELARIO's and SANTOS ORTIZ's ongoing drug trafficking activities, including phones used by LARA-CANDELARIO, records of drug trafficking, and drug proceeds, set forth in Attachment B-1, will be found at Target Location #12.

**(13) PAPO's Residence – Target Location #13**

Description of Target Location #13

191.    **267 Fuller Street, Apartment 1R, Dorchester, Massachusetts ("267 Fuller Street")** is a multi-unit, three-story apartment building, that has beige vinyl siding. On each side of the building, there are three levels of exterior balconies. The entry door is located in the center of the building. The number "267" is affixed to the front door, which is white. There are black iron

railings that lead to the front door. The entry door to the building leads to a vestibule that has a secure door that leads to a common hallway. Target Location #13 (Apartment 1R) is the first floor apartment, located on the front right side of the building. A detailed description and photograph appear in Attachment A-13, which is attached hereto and incorporated herein by reference.

192.     I believe PAPO resides at Target Location #13. Investigators have observed PAPO coming out of 267 Fuller Street, most recently on August 4, 2020. On August 6, 2020, at approximately 11:00 p.m., investigators used a cell-site simulator to locate PAPO's phone, pursuant to a warrant. The cell-site simulator indicated that his phone was inside of Target Location #13. While the cell-site simulator was being deployed, investigators observed PAPO sitting on a sofa inside of Target Location #13 looking at and using his phone. Moreover, location data for PAPO's phone indicates it is at 267 Fuller Street in the nighttime and early morning hours, including at times PAPO was known to be at the location.

Link to Criminal Activity

193.     As detailed herein, PAPO has been intercepted numerous times over SANTOS ORTIZ's phones discussing mixing, cutting, and pressing drugs. Intercepted calls also indicate that PAPO is sometimes paid for his services in drugs, which I believe he distributes to his own customers. Accordingly, I believe that evidence of PAPO's drug trafficking activities, including phones used by PAPO, records of drug trafficking, and drug proceeds, set forth in Attachment B-1, will be found at Target Location #13.

DRUG TRAFFICKERS' USE OF RESIDENCES AND CELLULAR TELEPHONES

194.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain

their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

195.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

196.    Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

197.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

198.    Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

199.    When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement.

In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

200.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B and B-1 on their cellular telephones.

201.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

202.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can

also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

203.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

204.     I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

a.   controlled substances;

b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c.   books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.   personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.   cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and

precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.  firearms and other dangerous weapons; and

i.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

205.    Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking. I believe that evidence of their drug trafficking offenses will be found inside each of the Target Locations and on certain cellular telephones seized therefrom.

## CONCLUSION

206.    Based on the information set forth above, I believe probable cause exists to conclude that the Target Subjects have conspired to possess with intent to distribute, and to distribute 400 grams or more of fentanyl, heroin, and cocaine, in violation of 21 U.S.C. §846, and that evidence of said criminal offense, as set forth in Attachments B and B-1 of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

I, Mark J. Concannon, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

/s/ Mark J. Concannon

_____

MARK J. CONCANNON
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this _____10th day of August 2020.

HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

110